## Case No. 17,158.

### WARD et al. v. The OGDENSBURGH.

[5 McLean, 622;[1] Newb. 139; 10 West. Law J. 433.]

District Court, D. Ohio. Oct. Term, 1853.[2]

COLLISION — SUFFICIENCY OF LOOKOUT — VESSELS MEETING — DUTY OF STEAMERS TO SLOW DOWN — PRACTICE—CROSS LIBEL—JOINDER OF ACTIONS IN REM AND IN PERSONAM.

1. The maritime law is rigid in its exactions of unremitting care and vigilance on the part of those entrusted with the navigation and safe keeping of vessels of every kind, to avoid acci-

[1] [Reported by Hon. John McLean, Circuit Justice.]

[2] [Reversed in Case No. 17,151. Decree of circuit court affirmed by supreme court in 21 How. (62 U. S.) 572.]

dents and injuries by collision. Any negligence, inattention, or want of skill, resulting in injury to others, will entitle the sufferer to remuneration.

[Cited in The Iron Chief, 11 C. C. A. 198, 63 Fed. 291.]

2. A competent and vigilant look-out, stationed at the forward part of the vessel, and in a position best adapted to descry vessels approaching, at the earliest moment, is indispensable, to exempt the steamboat from blame in case of accident in the night time, while navigating waters on which it is accustomed to meet other watercrafts. The mate, who has command of the deck, is not a sufficient look-out. He must be a person who makes the look-out his exclusive business. Nor is the wheel-house a proper place to station the look-out. He should be stationed forward, where he can see without interruption.

[Cited in The Ancon. Case No. 348.]

3. In general, it is the duty of vessels, whether propelled by steam or wind, when meeting dead ahead, or nearly so, to port helm, and each turn to the right. But if they are approaching, with berth enough to exclude the possibility of their coming together, each pursuing its onward course, they are not required to port helm. Porting the helm, under such circumstances, may be a fault.

[Cited in The Golden Grove, 13 Fed. 691.]

4. When steam vessels are approaching each other, and from the darkness or fog, there is the least uncertainty as to the course or position of the other, it is the duty of each instantly to check the speed, and then, if necessary, to stop, and back.

5. The defendants in an admiralty suit, who have suffered from a collision, and are in no fault themselves, may by a cross libel set up the damage they have sustained, and will be entitled to a decree in their favor for compensation.

6. The libellants can not join in this libel a demand in rem against the vessel, and one in personam against the owners. He may proceed in rem, or in personam, or successively in each way, until he has full satisfaction, but he can not blend the proceedings in one libel.

[Cited in The Illinois, Case No. 7,003; The Sabine, 101 U. S. 389; Joice v. Canal Boats Nos. 1,758 and 1,892.]

³ [This was a libel for collision, brought by the owners of the steamboat Atlantic, a large, first class passenger steamboat, running between Buffalo and Detroit, against the propeller Ogdensburgh, a freight boat running from Cleveland through the Welland Canal to Ogdensburgh, and against the owners of the boat; the libel being in personam and in rem. The facts of the case will be found so much at large in the opinion of the judge, that it is not necessary to repeat them here. The respondents excepted to the libel for a misjoinder.

[Spalding, in support of the exception, citing 1 Conk. Adm. §§ 380–386; Citizens' Bank v. Nantucket Steamboat Co. [Case No. 2,730]; 3 Hagg. Adm. 114; Sup. Ct. Rules Adm. 15; Ben. Adm. p. 215, § 391; The Hope, 1 W. Rob. Adm. 154; The Volant, Id. 385; [Waring v. Clarke] 5 How. [46 U. S.] 441; Laws 1843, 5 Stat. 626; Leland v. Medora [Case No. 8,- 237.]

[Lothrop, in reply, citing for analogies, The Anne [Case No. 412]; Citizens' Bank v. Nan- tucket Steamboat Co. [Case No. 2,730]; Arthur v. The Cassius [Case No. 564]; Ben. Adm. §§ 387, 396, 397.

[After a full argument, the judge reserved his opinion to be incorporated in the final decree. The testimony in the case was then taken, occupying seven days.

[On behalf of libellant, the following references were made: Abb. Shipp. marg. p. 236; Rules of the Trinity, 9 & 10 Vict.; Abb. Shipp. 237; Story, Bailm. § 611b; The Friends, 1 W. Rob. Adm. 478; The Sciota [Case No. 12,- 508]. There are four classes of circumstances under which collision may occur: (1) Inevitable accident; neither party to blame. (2) Where both parties in fault. (3) Where suffering party alone is to blame. (4) Where the fault is in the party doing the damage. The Woodrop-Sims, 2 Dod. 83; Story, Bailm. 608 et seq.; Reeves v. The Constitution [Case No. 11,659]; 1 Conk. Adm. 300, 301, 303; Abb. Shipp. 229; The Rival [Case No. 11,867]; Story, Bailm. 611; 2 Wend. 452; 19 Wend. 397; St. John v. Paine, 10 How. [51 U. S.] 584, 605; [Williamson v. Barrett] 13 How. [54 U. S.] 108.

[On behalf of respondents, the following references were made: 2 Dod. 83; 2 W. Rob. Adm. 217; The Emily [Case No. 4,452]; The Northern Indiana [Case No. 10,320], MS. Dec. of Judge Hall, of N. Y., 1852; Waring v. Clarke, 5 How. [46 U. S.] 498; The Europa, 2 Eng. Law & Eq. 557; St. John v. Paine, 10 How. [51 U. S.] 557; The James Watt, 2 W. Rob. Adm. 270; 3 W. Rob. Adm. 75; Whart. Dig. 388; Halderman v. Beckwith [Case No. 5,907]; The Rose, 2 W. Rob. Adm. 2; The Iron Duke, 2 W. Rob. Adm. 377.] ³

Lothrop, Swayne, Wade & Newberry, for libellant.

Spalding, Stanbery, McNett & Kimball, for respondents.

LEAVITT, District Judge. The libellants aver substantially, that said steamboat, being of eight hundred tons burden, with passengers and freight on board, left Buffalo on the evening of the 19th of August, 1852, for Detroit, and proceeding on her voyage across the lake, by the usual and direct route, with all her signal lights burning and in good condition, about half-past two o'clock, in the morning of the 20th of August, off Long Point, on the Canada shore, was run into with great violence by the propeller Ogdensburgh, then on her way from Cleveland to the entrance of the Welland Canal; the said steamboat being struck on her larboard side, near the forward gangway, and the guard and hull being so broken, that she filled with water, sunk, and was a total loss to the libellants. It is also averred, that at the time of said collision, the Ogdensburgh did not have lights burning and properly displayed, as required by law; and was not then steering on the usual and proper route from Cleveland to the Welland Canal; and, that on the

approach of the Atlantic. though clearly visible for at least two miles. the propeller did not stop her engine, lessen her speed, alter her course. or take any other precaution to avoid a collision. It is also alleged, that the officers and crew of said steamboat, as the propeller approached. first put the helm a-port, and then hard a-port, to get out of the course of the propeller, and used every effort to prevent a collision, but that the propeller, though seeing the lights of the Atlantic at a great distance, did not port her helm. or slacken her speed, or display lawful signal lights, but was so unskillfully and improperly managed, that she was run nearly at right angles into and against the Atlantic; and that the collision resulted from the carelessness. negligence, and unskillfulness of the officers and crew of said propeller; and that the libellants have sustained damage thereby to the amount of one hundred thousand dollars.

The answer of Chamberlain & Crawford, the claimants of the Ogdensburgh, which they aver to be a propeller of three hundred and fifty-three tons burthen, sets up in substance, that she left Cleveland with a heavy freight, about twenty minutes after twelve o'clock, in the afternoon of the 19th of August, 1852. and proceeded by way of Fairport. toward Ogdensburgh. New York, the place of her destination, which was to be reached by means of the Welland Canal, in Canada; that about two o'clock, the next morning, steering her proper course, N. E. by E., for the entrance of said canal. the wind being light from S. W., and the weather somewhat hazy. her watch on deck discovered a steamboat light, from two to three points off her starboard bow. and at the supposed distance of three miles; that keeping on her course at a speed of about seven miles an hour, her mate ascertained that the light was fast nearing her. and gave the signal to "slow" the engine; which was done, and the light still coming nearer, an order was given to stop; that finding the boats were in danger of collision. the engine of the propeller was reversed. and she was backed; that these orders were given with all possible dispatch. but in spite of all these precautions a collision ensued.

The answer then avers. that by reason of the Atlantic's turning from her proper course, and continuing with unabated speed fifteen miles an hour, in a direction across the bow of the propeller. she fell with all her momentum upon the propeller's stem. wrenching it out of place. and carrying her half round. It is charged, that the collision was wholly caused by the unparalleled recklessness of the persons in command of the Atlantic: and that those navigating the propeller managed her according to the approved rules of lake navigation. and with a due regard to the safety of both vessels. It is also averred. that the propeller had all her lights burning. and displayed as required by law.

The claimants ask for a decree for the injury sustained by the propeller. as the result of the collision. and by the agreement of the parties, such a decree is to be rendered in this case, if in the judgment of the court the claimants are entitled to compensation. It is also further agreed, that the value of the Atlantic was seventy thousand dollars, and is to be so considered by the court if it shall be adjudged that the libellants are entitled to a decree in their favor.

The matters in controversy in this case are indicated by the foregoing summary statement of the libel and answer.

A great mass of testimony, partly oral and partly in the form of depositions, has been exhibited to the court in support of the opposite claims of the parties, and as usual in investigations growing out of marine collisions, there is, in some material points, great conflict in the testimony. Without noticing the large portions of the evidence, which have no direct bearing on the points in dispute. I shall refer to that only which forms the basis of the conclusions to which I have been led.

But before noticing the facts. it will be proper to state some of the settled doctrines of the maritime law as to collisions. Lord Stowell, justly distinguished for his eminent ability as an admiralty judge, classifies the cases in which collisions may occur as follows: "In the first place a collision may happen, without blame being imputable to either party, as where the loss is occasioned by a storm, or other vis major. In that case the misfortune must be borne by the party on whom it happens to light; the other not being responsible to him in any degree. Secondly: A misfortune of this kind may arise where both parties are to blame, where there has been want of due diligence or skill on both sides. In such case the rule of law is, that the loss must be apportioned between them, as having been occasioned by the fault of both of them. Thirdly: It may happen by the conduct of the suffering party only; and then the rule is, that the sufferer must bear his own burden. Lastly: It may have been the fault of the ship which ran the other down; and in this case, the innocent party would be entitled to an entire compensation from the other." 2 Dod. Adm. 83; Abb. Shipp. marg. p. 230.

It is clear, from the general phase of the present case. that it does not fall within the first classification. The disastrous collision under consideration did not happen through an agency beyond human control. There is a fault resting somewhere; a wrong-doer, chargeable with want of skill, or inattention to duty. The libellants insist that they are losers of their valuable steamboat and her appendages. by reason of the mismanagement of the Ogdensburgh. The respondents, on the other hand, insist, not only that they are not liable for the loss of the Atlantic. but that they are entitled to compensation for the injury sustained by them, as the result of the collision.

To make good their claim to indemnity, the libellants must show that the collision was caused by the fault of the other party. and that no censure attaches to those charged with the management and navigation of their boat. And, if

the respondents would show a just ground of claim for remuneration for their loss, it must appear that they are without fault. I think there is no foundation for urging that the present is a case of mutual culpability, calling for an apportionment of the loss between both parties. The maritime law is rigid in its exactions of unremitting care and vigilance on the part of those entrusted with the navigation and safe keeping of vessels of every kind, to avoid accidents and injuries by collision. Any negligence, inattention, or want of skill, resulting in injury to others, will entitle the sufferer to remuneration. These are general and admitted principles, touching the rights and liabilities of parties, in cases of collision. It is now proper to inquire what is the result of their application to the facts of this case.

The facts, as exhibited in the evidence of the opposing parties, are in some essential particulars, widely variant. On the part of the libellants, the material facts proved, may be summarily stated as follows: The steamboat Atlantic, the property of the libellants, being a first class passenger boat on Lake Erie, of the tonnage before stated, and with an engine of a thousand horse power, navigated and managed with the usual complement of officers and hands, having on board, including passengers and crew, between five and six hundred persons, and furnished with the lamps and lights required by law, and the usages of lake navigation, left the port of Buffalo about, or a few minutes after, 9 o'clock in the evening of the 19th of August last, on her regular trip to Detroit. It seems according to the usual course of navigation by steamers between the places named, that Point au Pelee, putting out from the Canada shore, near the upper end of the lake, is the terminus of a direct line usually pursued; the course from Buffalo to that point bearing S. W. by W. This line of navigation runs within a short distance of Long Point, on the eastern extremity of which there is a lighthouse. This is sixty-eight or seventy miles distant from Buffalo. On the night in question, the Atlantic pursued the usual course of steamers, and came abreast of Long Point light-house about 2 o'clock. It was a star-light night, but a haze or smoke hung over the lake, extending upward from twenty-five to thirty feet, which rendered it difficult to discover objects involved in it at any considerable distance. The second mate of the boat was on watch from the time of leaving Buffalo till the collision.

It was the starboard watch, as it is called by mariners, and belonged properly to the master, who, on this occasion, does not seem to have been on deck during the entire watch. The second mate and wheelsman were joined on deck, at 12 o'clock, by a passenger, who had some experience as a navigator on the lake. According to the testimony of the three persons, after the Atlantic had proceeded about one mile beyond Long Point light, a little after two o'clock they made a light—two white lights—which the mate took for the lights of a sailing vessel, heading southward. These witnesses

agree in the statement that the steamer holding on her course S. W. by W., made the lights seen from a half to three quarters of a point over her larboard bow, indicating that the position of the approaching craft was a little south of the line of the steamer's course. The lights, when first seen, in the opinion of one of the witnesses, were about one mile distant. The steamer kept her course, under a full head of steam, at the rate of not less than fifteen miles an hour, when it was ascertained distinctly that the lights seen belonged to a propeller steering for Gravelly Bay, through which the entrance into the Welland Canal is reached. The steamer continued to approach without any diminution of her speed, until within three or four lengths of the boat from the propeller, when the order was given to the wheelsman to port his helm, which was almost immediately succeeded by the order to put the helm hard a-port. Very soon after the Atlantic's larboard side, just aft the forward gangway, came violently in contact with the propeller's bow, causing a breach in the steamer's side some seven feet in width, extending downward below the water line, and inward nearly to the middle hatch. Without stopping the engine, the order was given to head her to the shore, and after running between half a mile and a mile, such was the rapid inflow of water, that she sunk at a point where the lake is twenty-five fathoms deep.

Such is the case, very briefly stated, as presented by the witnesses for the libellants. On the part of the respondents, the witnesses produced are the master, wheelsman, first mate, clerk, engineer, and a fireman on the Ogdensburgh. In the first place it may be remarked, that they satisfactorily disprove the allegation in the libel that the propeller was not furnished with and did not display, on the night of the collision, the red and green signal lights required by statute. The boat was provided with these lights, and they were suitably displayed and lighted.

The Ogdensburgh in addition had two white globe lights on her cross-trees, together with several lesser lights. These, it is in proof, were all lighted, and in good order throughout the night on which the collision occurred.

It appears that starting off across the lake from a point a few miles off Ashtabula, on the southern shore, the propeller was put upon her proper course, N. E. by E., for the entrance of the Welland Canal; and that, although there had been previously a slight variation from it, she was on it when the lights of the steamer were made, and continued upon it till the collision happened; that the lights of the Atlantic were first made by the propeller two and a half points over her starboard bow, and at the estimated distance of two and a half or three miles; that the mate having first taken the bearings of the light by compass, and seeing that the light opened a few points on the starboard, had ordered the wheelsman to keep on his course, and immediately thereafter, being uncertain

as to the bearings of the steamer's lights, gave the order to slow the engine; that after watching the lights closely for a short time, the mate saw the red signal lights of the steamer, and ascertaining that she was within four or five times her length of the propeller, rung the bell to stop and back almost simultaneously; that before the order to slow, the propeller was running at the rate of eight miles an hour; that after the order to slow, and when the orders to stop and back were given, her speed had been reduced to about three miles an hour; that all the orders referred to had been promptly obeyed, and the propeller brought almost if not wholly to a stand; that the Atlantic, without either slowing or stopping, continued her course toward the propeller, heading, as the nautical phrase is, "stem on;" that the mate seeing the collision inevitable, gave the order to starboard the helm, hoping thereby to receive only a glancing blow, but this movement produced little or no effect, as the propeller was stopped or nearly so, and of course did not obey her helm. The Atlantic thus struck the bow of the propeller, causing the breach in the steamer before noticed, and carrying away the lower part of the propeller's stem, loosing and turning the other part from its position, unfastening the ends of the planks, and causing an opening through which the water found its way into the boat.

This synopsis of the testimony on both sides, as to the course and relative position of the boats, when the lights of each other were made, their subsequent conduct, and the facts relating to the collision, will suffice to show the material discrepancies between the witnesses on either side, and afford some intelligible landmarks for the court, in settling the rights of the parties.

It will be noticed that the essential differences between the parties consist in the opposite statements of the witnesses as to the bearings of the lines, on which the steamer and the propeller neared each other. On the hypothesis of the libellants, the lights of the propeller were first seen, in seamen's phrase, nearly dead ahead of the Atlantic, being less than a point over her larboard bow. Thus meeting, if the Atlantic had exercised the proper precaution of checking her speed, and porting her helm, and the propeller had failed to use the proper prudential measures, a collision being the result, the fault would be chargeable to the latter. But, on the respondents' proof, the lights of the steamer were seen two and a half points over the propeller's starboard bow, indicating clearly that she was on her proper course, north of the steamer's proper line of travel; and that, by improperly porting and hard porting, the steamer had been turned too far north, and carried across the propeller's bows. This latter supposition, I am obliged, as the case is presented, to adopt. I have failed to perceive any reason, why the statements of the respondents' witnesses, as to the matters in which they are in conflict with those of the libellants, should be repudiated. They are not only more numerous, but for reasons of a higher and more decisive character, better entitled to credit.

In this view, how stands the case? The propeller has done all that reason, usage, or law required. The many experienced and highly intelligent navigators, who have testified as experts, have declared as with one voice. that every precautionary measure adopted by her was sensible and judicious. She did all in her power to avoid the collision, while she omitted nothing that could have been done. True, the order given by her mate to starboard the helm just preceding the collision, was not called for; but for the reason before stated, it produced no result. and may well be designated as "an error," without being "a fault."

In coming to this conclusion, I am not unmindful that it was strenuously insisted in the argument. that by the settled usages of navigation, as also by judicial determinations, it is the duty of vessels, whether propelled by steam or wind, when meeting "dead ahead," or nearly so, to port helm. and each turn to the right. There can be no doubt of the existence of this rule, or of its obligatory nature; but it must be limited to cases in which it properly applies. The experts who were questioned on this subject. agree in stating, that if two boats or vessels are approaching in opposite directions, yet with berth enough to exclude the possibility of coming together, each pursuing their onward course, they are not required to port helm. Indeed, they agree in stating what is clearly obvious, that in the case supposed, the porting helms would tend rather to bring about, than avoid, collisions. These experts also say, that under the circumstances in which the Atlantic and the Ogdensburgh approached, the latter was not required to depart from her course, and that the Atlantic was wrong in porting her helm and diverging from her track.

It is clear then that the libellants have no claim to compensation from the owners of the Ogdensburgh, for the whole or any part of the loss sustained by them, as a result of this disastrous collision. It remains to inquire, whether a decree shall pass against the libellants for the loss suffered by respondents in the injury to the propeller.

By agreement of parties, the question whether it is competent in a proceeding by libel, where the answer, as in this case, asserts a claim against the libellants, and prays for a decree accordingly, to treat it as a cross libel, is waived; and it is stipulated that a decree may be entered for the owners of the Ogdensburgh, if in the opinion of the court, they are entitled to it. on the law and facts of the case. The right to such a decree depends clearly on the answer to the inquiry, whether their loss is attributable to the sole fault of the libellants' steamer. That the libellants are great sufferers from the collision, and have chosen to initiate this pro-

ceeding, can not deprive the owners of the propeller of their claim to compensation, if they are chargeable with no fault. They are to be viewed precisely as if they were the libellants, seeking indemnity for a loss: and, if they make out a good case, are entitled to a decree in their favor.

The inquiry is then presented, whether the facts and the law applicable to them, show a case of such exclusive culpability on the part of the Atlantic as not only to preclude her owners from any right to compensation, but to make them responsible for the injury sustained by the Ogdensburgh. This is contended for, by the respondents' counsel, on several grounds.

1. It is insisted that the Atlantic had no sufficient watch on deck during the night of the collision. The night, as already noticed, was not dark, but the haze on the lake made it difficult to distinguish objects at any considerable distance. The route of the steamer, especially in the vicinity of Long Point light, was one much frequented by vessels and steamers, passing up and down the lake, and to and from points along the southern shore, by propellers and other craft, carrying on commerce with the lower lakes through the Welland Canal. The Atlantic was a steamer of great power, and of great speed; and, on the night referred to, was the freighter of between five and six hundred human beings. These facts are quite sufficient to justify the conclusion, that those entrusted with her management and navigation were called upon for the exercise of the greatest watchfulness and care. It seems the only persons on deck having any rightful connection with the steamer, from the time she left Buffalo till the occurrence of the terrible collision, which sent her to the bottom of the lake, and occasioned the loss of some two hundred human lives, were the second mate and the wheelsman. As before noticed, it was the captain's watch; and the testimony of the most experienced and reliable experts is, that under the circumstances of the case, it was wholly improper that the captain should have entrusted the care of the boat to the sole management of the second mate; an officer in whom the higher qualifications of a navigator are not looked for, and who, in the language of a very intelligent expert, is viewed as the mere "drudge" or assistant of the captain. In point of fact, the second mate, even if his competency for the station is admitted (which is, at least, doubtful), did not keep a vigilant look-out, within the requirements of the decisions of the highest judicial tribunals of the country. He was, by his own statement, in the pilot house at the time he made the lights of the propeller, looking from one of the windows: and did not make these lights till they were about one mile distant.

In the case of St. John v. Paine, 10 How. [51 U. S.] 557, it was said by Judge Nelson, in delivering the opinion of the court, that "the steamboat was in fault in not keeping at the time a proper look-out on the forward part of the deck; and that the failure to descry the schooner at a greater distance than half a mile ahead, is attributable to this neglect. The pilot-house in the night, especially if dark and the view obscured by clouds in the distance, was not the proper place, whether the windows were up or down. The view of a look-out stationed there must necessarily be interrupted." And in the same case the court held, "that a competent and vigilant look-out, stationed at the forward part of the vessel, and in a position best adapted to descry vessels approaching, at the earliest moment, is indispensable to exempt the steamboat from blame in case of accident in the night time, while navigating waters on which it is accustomed to meet other water craft." And again, the court, said: "There is nothing harsh or unreasonable in this rule; and its strict observance and enforcement will be found as beneficial to the interests of the owner, as to the safety of navigation."

In the case of The Genesee Chief v. Fitzhugh, 12 How. [53 U. S.] 443, in giving the opinion of the court, Chief Justice Taney says: "It is the duty of every steamboat traversing waters where sailing vessels are often met with, to have a trustworthy and constant look-out, besides the helmsman. It is impossible for him to steer the vessel, and keep the proper watch in his wheel house. His position is unfavorable to it, and he can not safely leave the wheel to give notice when it becomes necessary to check suddenly the speed of the boat. And whenever a collision happens with a sailing vessel, and it appears that there was no other look-out than the helmsman, or that such look-out was not stationed in a proper place, or not actively and vigilantly employed in his duty, it must be regarded as prima facie evidence that it was occasioned by her fault."

In a recent case of admiralty against the steamboat Northern Indiana, a passenger boat on Lake Erie, decided by Judge Hall, of the district court of the United States for the Northern district of New York, it was held, that the mate alone, while the officer of the deck, though in all respects competent to the duty, did not constitute a sufficient look-out, within the requirement of the decisions of the supreme court of the United States, referred to. The judge remarks that, "the mate was the officer of the deck, holding the temporary command of the vessel, and liable to be continually called to the discharge of duties inconsistent with the keeping of a constant and vigilant watch, and ought not to have been relied on for that purpose." In England, the rules prescribed by the courts in regard to look-outs are more stringent than in the United States. A case is reported in 2 Eng. Law & Eq. 557, in which the Europa, one of the Atlantic steamers, was condemned for an injury to a sailing vessel, occurring during a thick fog, on the route of steam travel between the United

States and England, on the ground of the insufficiency of her look-out; when the proof was, that there was an officer stationed on the bridge, a quarter-master on the top-gallant fore-castle, another quarter-master at the con, besides one at the wheel.

I can not hesitate to say, in view of these authorities, that the Atlantic did not maintain a sufficient look-out, on the night of the collision.

2. In the next place it is urged, that the steamer was guilty of a great error in porting, and then hard-porting her helm, thereby running across the bow of the propeller, so as to make the collision an almost certain result. It has been before stated, that in the relative position and courses of the two vessels, and the time the lights of each were made by the other, there was no obligation on the propeller to port her helm. From the width of the berth between the two boats, if each had kept its course, there could by no possibility have been a collision. They would have passed at a distance probably not less than a mile apart. The law, therefore, requiring vessels and boats, approaching on the same or near the same line, to port their helms, as already remarked, does not apply. And it was palpably wrong in the steamer, and necessarily attended with danger, to port her helm, and diverge from her course, especially without checking her speed. The movement indicated great want of skill and judgment in navigation. The steamer should have "given way" as the nautical phrase is, and have passed under the stern of the propeller. 2 W. Rob. Adm. 5.

3. But another fault, very much insisted on by the advocates for the respondents, was the omission of the mate to check the speed of the Atlantic. There is no pretense that any order to that effect was given, or that in fact the velocity of the boat was at any time checked. This gross dereliction of duty, if the mate of the Atlantic was chargeable with no other, would, under the circumstances of this case, make the boat responsible for all the consequences which followed. It is entirely without excuse or palliation. It is proved that the boat at the time of making the propeller's lights was going forward under high steam pressure, and her rate of travel was not less than fifteen miles an hour. Her mate says, that from the haze on the lake he did not see the propeller's lights till within about a mile of her; and concluded, when first seen, they were on a sailing vessel going south. Yet, notwithstanding the difficulty of vision, and the uncertainty that existed as to the character of the craft, and the direction of her course—her lights seen, as he says, less than one point over the steamer's larboard bow—he pressed on with criminal recklessness, and without the least reduction of her dangerous speed. The numerous experts who have testified in this case, as well those called for the libellants, as for the respondents, agree in saying, it was the obvious duty of the Atlantic's mate, when the propeller's lights were first made, if, after noticing their bearing, there was the least uncertainty as to their position and motion, instantly to check the speed of the steamer, and then, if necessary, to stop, and back. They agree also in saying, if this course had been pursued, there was not a possibility that a collision could have happened. The propeller, pursuing her course N. E. by E., would have passed beyond the reach of the steamer, and the frightful calamity that took place would have been avoided. And it is amazing that a course so plain and safe had not suggested itself to the mate. That instead of this, he should have crowded the helm hard a-port, and with unchecked velocity, turned the steamer almost across the path of the propeller, imports a recklessness and stupidity that argue badly for his fitness for the truly responsible position he occupied.

It was not deemed necessary to notice specially the judicial decisions, both in England and in this country, enforcing rigidly the obligations and duties of those connected with steam navigation. Many of these were presented and ably commented upon by the advocates of the respondents in the argument of this case. In addition to those noticed in the previous part of this opinion, many others were adduced, of pertinent application to this subject. Among them the following are noted: The Europa, 2 Eng. Law & Eq. 557; The Genesee Chief, 12 How. [53 U. S.] 443; The Rose, 2 W. Rob. Adm. 1; The Virgil, Id. 201; The James Watt, Id. 270; 2 Hagg. Adm. 356; The Leopard [Case No. 8,264]; Whart. Dig. 1852, Supp. 388.

The general tendency of these authorities is to enforce the duty of great caution, and unremitting vigilance, on the part of those engaged in the navigation of vessels propelled by steam. The obligation of lessening the speed of steamboats, under all circumstances, where unchecked velocity may be supposed to be dangerous, is especially enjoined. And there can be no question that the preservation of human life, as well as of property, demands at this day, when there is such a disposition to sacrifice everything to rapidity of movement, that owners and managers of steamboats should be held to a most rigid accountability.

I can not well conceive of a case, calling more urgently for the application of these principles, than the one under consideration. The calamity which has befallen the ill-fated Atlantic, putting in the most imminent peril the lives of upwards of five hundred persons, and attended with the actual loss of more than two hundred, has resulted from an insane neglect of duty in not checking her rapid speed at the proper time, and a desire to make headway at all hazards. And it is certainly a somewhat singular feature of this case, that her owners, responsible morally and legally, for the misconduct and incompetency of the officers and agents, whom they had placed in charge of their boat, should ask remuneration for a loss, arising clearly from their recklessness or unskillfulness. As to the master of the Atlantic, some conclusion may be drawn in relation to his pro-

fessional character and qualifications, from the fact, that although it was his watch, it does not appear that he was on deck, from the time the boat left Buffalo, till he was roused from his slumbers by the fatal collision; and afterwards was distinguished for his "masterly inactivity" in every thing but the carrying out of measures to save his own life. The second mate, who was invested with the sole management and command of the boat, and to whom was committed the safe keeping of more than five hundred persons, was not qualified for his trust, as is apparent from the facts already noticed. In a word, it is impossible to review the incidents of that sad catastrophe, without a painful impression, that those occupying official stations on the Atlantic were grossly deficient, not only in professional skill and intelligence, but in the higher moral qualities of trustworthy navigators.

Under the belief that the foregoing views sufficiently indicate the grounds on which it is designed to place the decision of this case, I forbear to notice some other points made in the arguments. In my judgment, the libellants on the law and the facts, are not entitled to a decree, either for the whole, or any part of the value of the steamer Atlantic; and the respondents have a just claim to compensation for the injury sustained by the Ogdensburgh, arising from the faulty management of the Atlantic. The amount of this injury, by agreement of parties, is three thousand dollars; for which sum I decree against the libellants, with costs.

In connection with this case, a preliminary question of admiralty practice is presented by the first article of the respondents' answer, as matter exceptive to the libel, which is stated as follows: "That the libellants have improperly joined a proceeding in rem against the propeller Ogdensburgh, with a proceeding in personam against the respondents as her owners." This point was argued fully before the hearing; and reserved for further consideration. Its decision now is no way material to these parties, as the court has decreed in favor of the respondents, on the merits. It may be desirable, however, that the views of the court on the point raised should be known, that the practice hereafter may conform to them.

After an examination of the authorities cited, in connection with rule 15, of the rules adopted by the supreme court of the United States, for the practice of the admiralty courts of the Union, I am satisfied that the joinder in the same libel of a proceeding in rem against a ship, and in personam, against the owner, in an action for damage by collision, is not admissible. In one case, before Judge Story, prior to the adoption of the rules of the supreme court, he expressed himself strongly against the propriety of such a joinder.

The case referred to is Citizens' Bank v. Nantucket Steamboat Co. [Case No. 2,730]. In the opinion delivered by Judge Story in that case, he remarks: "In the course of the argument it has been intimated that in libels of this sort, the proceeding might be properly instituted, both in rem against the steamboat, and in personam against the owner and master thereof. I ventured at that time to say, that I knew of no principle or authority, in the general jurisprudence of courts of admiralty, which would justify such joinder of proceedings, so very different in their nature, and character, and decretal effect. On the contrary, in this court, every proceeding of this sort has been constantly discountenanced, as irregular and improper." Again, the judge says: "In cases of collision the injured party may proceed in rem or in personam, or successively in each way, until he has full satisfaction. But, I do not understand how the proceedings can be blended in one libel." The case referred to was 'before Judge Story in 1841. At the January term, 1845, the supreme court, in pursuance of express authority conferred by an act of congress, prescribed the rules of admiralty practice. Rule 15 is as follows: "In all suits for damages by collision, the libellants may proceed against the ship and master, or against the ship, or against the owner alone, or the master alone, in personam."

There seems to be no room for doubt as to the true construction of this rule. It is understood these admiralty rules were drafted by Judge Story; and the rule above quoted, was designed to carry out his views of the correct practice, as very clearly stated in the foregoing extract from his opinion. The rule provides specifically how a party may be proceeded against for an injury by collision. It may be: (1) Against the ship and master. (2) Against the ship. (3) Against the owner alone. (4) Against the master alone, in personam. Clearly a proceeding in rem against the ship, and in personam against the owner, not being authorized by this rule, is prohibited.

The rule quoted was thus understood and construed by the late Judge Woodbury. In Leland v. The Medora [Case No. 8,237], in delivering the opinion of the court, he says: "The other objection is the misjoinder of the vessel and owners, in the same libel. This involves a proceeding in personam and in rem, in the same case, and contravenes the settled rules of admiralty proceedings." He refers to rule 15, before cited, and also the 17th rule, as sustaining his views. Judge Conkling, in his work on Admiralty (volume 2, p. 380 et seq.), after discussing the question, whether before the adoption of the rules of the supreme court, a proceeding in rem and in personam could be joined, holds, that the practice, if it was before allowable, is abolished by rule 15.

I see no reason to doubt the conclusion, that at least, in suits for collision, it was the intention of the supreme court to direct what proceedings were admissible; and in pointing out the course which they regarded as proper, to prohibit all others. The exception to the libel is therefore sustained, and the libellants have leave to amend.

[NOTE. On appeal to the circuit court, the decree entered in this case was reversed, and a decree entered equally dividing the damages be-

tween the parties. Case No. 17,151. From the latter decree, both parties appealed to the supreme court, by which the same was affirmed. 21 How. (62 U. S.) 572.]