## THE PENNLAND.[1]

*(District Court, S. D. New York. March 19, 1885.)*

1. COLLISION—STEAMER AND SAILING VESSEL—CROSSING COURSES—RULE 20.

   Where a collision occurs between a steamer and a sailing vessel, the former being obliged under rule 20 to keep out of the way, the steamer will be held liable, unless she excuses herself by proof of some misconduct on the part of the sailing vessel, or by proof of such a condition of fog, and of such a compliance on her part with all the rules of navigation, as to absolve her from fault, and reduce the case to one of inevitable accident.

[1] Reported by R. D. & Edward Benedict, Esqs., of the New York bar.

2. SAME—SPEED IN FOG—CASE STATED.

 The brig S. C., sailing by night, close-hauled, on a S. S. W. course, saw off her port beam both colored lights of the steamer P., estimated a half mile or more distant, and kept on without altering her course. There was a thickness of the atmosphere down near the water, such as to cause a serious obstruction to the visibility of lights. The P., running nearly 12 knots an hour on a course W. by N. ¼ N., saw the brig's red light about 600 yards off, nearly ahead, and then, without decreasing her speed, starboarded and changed her course five points during about a minute and a half following, when, in the act of slowing, she was struck by the brig about 80 feet forward of her stern. The above facts being found upon very conflicting evidence, *held*, (1) that in such a condition of weather the steamer should have gone at a reduced speed; (2) that, as the red light of the brig was seen nearly ahead, and the wind being westerly, the steamer must have known that the brig was going to the southward of the steamer's course, and consequently should not have altered her course so as to attempt to cross the bows of the brig, but should have ported and gone astern; and that the steamer was solely liable for the collision.

3. SAME—FLASH-LIGHT—BURDEN OF PROOF—PROXIMATE CAUSE.

 Where it clearly appears that a lighted torch, exhibited by a sailing vessel to an approaching steamer, could not have conveyed any additional information of any use to such steamer, the omission of it is not a proximate cause of the collision, and is immaterial. The burden of proof to establish that it would not have given additional information is upon the sailing vessel. *Held*, that in this case she had done so.


In Admiralty.

At about 2 A. M. on the fifth of July, 1883, the steam-ship Penn-land, of the Red Star line, bound from Antwerp to New York, when near Nantucket, in crossing the bows of the brig Stacy Clark, bound from the Kennebec river to Savannah, carried away the latter's jib-boom, bowsprit, and head-gear, to recover damages for which this libel was filed. The brig was 136 feet long, 373 tons register, loaded with ice, sailing close-hauled upon her starboard tack, in a moderate wind from the westward, in a rough sea, a hazy or foggy night, and heading S. S. W. She kept her course until the collision. The Penn-land was an iron steamer 350 feet long, and, until a short time before the collision, was making, according to her own testimony, a compass course of W. by N. ¼ N. After 12 o'clock, though it was fine and clear overhead, it became hazy below, which about 2 o'clock, very shortly before the collision, increased to a thick fog. Her fog-whistle had been started, and three blasts given, about a minute apart or a little less, before the collision. Her previous speed was from 11½ to 12 knots. Shortly after the first blast of the steam-whistle, the second officer, who was in charge of the navigation, signaled to the engineer in charge, first, to stand by; and afterwards, to go half speed. The signals were obeyed. The engineer testified that he was in the act of obeying the half-speed signal when the shock of the collision came. The brig's red light was first seen a little on the starboard bow, at an interval before the collision variously estimated by the steamer's witnesses of half a minute to a minute and a half. When the red light was seen, the steamer's helm was put hard a-starboard to go ahead of the brig, because, as the first officer states, the brig was judged to be too near to attempt to go astern of her by port-

ing. The fourth officer, who was in the wheel-house, estimates that the steamer ran about a minute and a half under her starboard wheel, and that she changed her course five points up to the time of the collision. No fog-horn was heard from the brig. Two of her witnesses, however, testify that they heard the steamer's fog-whistles, and an-. swered each with a fog-horn; that the weather was hazy, but not foggy; that they saw the steamer's green light about abeam on the port side, estimated at a mile distant. No flash-light was exhibited.

*Benedict, Taft & Benedict,* for libelant.

*Man & Parsons,* for claimant.

BROWN, J. The steamer in this case was bound under rule 20 to keep out of the way of the brig. She must be held answerable for not having done so, unless she excuses herself by proof of some misconduct on the part of the brig, or by proof of such a condition of fog, and of such a compliance on her part with all the rules of navigation, as absolve her from fault and reduce the case to one of inevitable accident. *The Carroll,* 8 Wall. 302–304. The principal controversy has been in reference to the existence and character of the alleged fog. The difference between the witnesses is to some extent verbal, rather than substantial. Both sides speak of the weather as in a condition of increasing haziness, rather than of fog proper. Some of the claimant's witnesses speak of it as very thick at the time of the collision; while the captain of the brig insists that there was no fog proper until an hour after the collision, and that lights at the time of the collision could be seen a mile. It is evident, however, that there was such thickness in the atmosphere down near the water, though clear overhead, as to cause a serious obstruction in the visibility of lights, as contemplated by the rules of navigation, though I have no doubt that the greater thickness of the fog subsequent to the collision has been referred by the claimant's witnesses to the time of the collision itself. The thickness of the fog is material only as respects the distance at which the brig's red light could be seen on board the steamer. There are sufficient circumstances in the case to show conclusively that her red light not only could be seen, but was seen, at such a distance as to charge the steamer with fault. Mere estimates of time and distance, not confirmed by acts done at the time, are entitled to little weight. But such acts are proved in this case to have been done after the brig's red light was seen, as show that the interval was not far from a minute and a half, and the distance traversed by the steamer not far from 600 yards. The fourth officer estimates the interval at a minute and a half from the time when the steamer's helm was starboarded, in consequence of seeing the red light, until the collision. He was in the pilot-house at the time, and testifies that the steamer went off five points under her starboard wheel. The proofs before me in other cases as to the rate of the change of steamers of this class show that this change would be made in about 600 yards. See *The Lepanto,* 21 FED. REP. 651, 664. The Pennland, being somewhat

larger than the Lepanto, would make a larger circle, other conditions being in proportion. As the steamer's speed was about 12 knots, and was not checked up to the time of the collision, this would give precisely a minute and a half as the interval during which a change of five points would be made, assuming the mean average rate of one point's change in 360 feet. It is possible that the fourth officer's estimate of time was based in part upon his knowledge of the rate at which the Pennland changed her course.

Again, there were three whistles about a minute apart given as a fog signal prior to the collision. Several of the witnesses state that the red light was seen between the first and second whistles. The captain, also, had time to dress himself hurriedly in the same interval. It is urged for the claimants that the time was much shorter than this, because it appears that the engineer was in the act of obeying the order to slow down at the moment of collision; while this order, it is said, was given immediately after the first whistle, and immediately obeyed. But entire reliance cannot be placed on the several items which make up these premises. There were two orders to the engineer: one to stand by, followed by an order to slow down. It would be very easy for the officer in charge to mistake the precise order of sequence in which these various directions and the whistles were given, and the interval which separated them. *The Arklow*, L. R. 9 App. Cas. 136, 141. This kind of testimony is evidently insufficient to rebut the circumstances I have above referred to. The inevitable inference is, either that the order to slow down was not given until. after the third whistle, or else that the engineer was tardy in obeying it. While a considerable time is necessary for some vessels to reverse the engine and get it working astern, but a few seconds is needed to execute the order to slow upon a steamer making, like this, 55 revolutions per minute.

The testimony of the witnesses for the brig is certainly not without some weight as to their estimates of time and distance, although much less trustworthy as respects the distance at which their own light would be seen from the steamer. They estimate that the steamer's green light was seen a mile distant; but her light may have been seen, and probably was seen, at a greater distance than the brig's, as the steamer's light was probably a stronger light and higher above the water. There is no reason to distrust the testimony of the captain, that on hearing the report of the steamer's lights he came up from the cabin; saw both colored lights of the steamer about abeam; took a hasty look at his own red light to make sure it was burning brightly; returned to the companion-way; observed the red light of the steamer then shut in; knew from that circumstance that the steamer had starboarded, so as to cross his bows, because in no other way could the red light under the circumstances have been shut in; and that he immediately took the wheel, because he recognized the consequent danger of collision; and his estimate is that it was from one to two

minutes after that change that the collision occurred. These circumstances all together furnish more satisfactory proof than the court is often obliged to act upon in collision cases, and show that the time between the collision and the first notice of the brig's light by the steamer was not far from a minute and a half, and that the distance traversed by the steamer was not far from 600 yards. If an arc be projected of that length, covering five points of a circle, (given by a radius of about 1,825 feet,) it will be seen that between starboarding and the collision the steamer must have made an offing to the southward from her previous course (counting from her main rigging) of about 625 feet. As the brig was but 136 feet long, or, including her bowsprit and jib-boom, possibly 170 feet, it is clear that had the steamer kept her course she would have passed far astern of the brig; and it is equally clear that no admissible margin of variation from the estimate of the rate of change in her course above made would make any material difference in this result.

From the above considerations two faults of the steamer become clear: (1) Assuming that there was a sufficiently dense haze or fog, as her witnesses assert, to require the sounding of the fog-whistle at the time when the first whistle was given,—namely, the third blast before the collision,—it was her duty to go at moderate speed under rule 21; that is, reduced speed. *The Colorado,* 91 U. S. 692; *Clare v. Providence & S. S. Co.* 20 Fed. Rep. 536; *The Beta,* L. R. 9 Prob. Div. 134. (2) From the direction of the wind it was manifest to the steamer, inasmuch as the brig's red light was seen, that the brig must be going to the southward; that she could not be moving at a greater angle than at right angles with the steamer's course, and might be approaching her at a much less angle. There was, therefore, manifest risk of collision, unless the steamer could avoid it by porting; and that she did not do, but starboarded. The risk of collision was, therefore, imminent until she had crossed the brig's bows upon the course adopted. The rule in such cases positively requires a steamer to slacken her speed, and, if necessary, to stop and back. She did neither, during the interval of about a minute and a half; and she was only in the act of slowing when the collision took place. It is true that a steamer is not bound to slacken speed when it is clear that continuing at full speed offers the only chance of escape. But in departing from the rule the steamer takes upon herself the burden of showing that such a departure was necessary. *The Alaska,* 22 Fed. Rep. 548, 553; *The Elizabeth Jones,* 112 U. S. 514, 523; S. C. 5 Sup. Ct. Rep. 468, 473; *The Elizabeth Jenkins,* L. R. 1 P. C. App. 501. The event in this case shows that no such departure was necessary, and that there could not have been any such circumstances existing at the time as even apparently justified it.

The brig was at the least 500 yards distant from the steamer when her red light was seen. Several of the steamer's witnesses, indeed, say that the brig's red light was first seen two and a half points on their

starboard bow. This is a manifest error. If that had been her position, the steamer's two colored lights could not at any time have been seen upon the brig; whereas all her witnesses testify that they were both seen together when the steamer first came in view. The brig, moreover, in order to reach the place of collision from a situation two and a half points on the steamer's starboard bow at a distance of 500 yards, would have been obliged to traverse at least 400 yards; a speed, during a minute and a half, equal to nine knots, or nearly twice her actual speed. After the steamer changed her course to port, the brig bore upon her starboard bow, and so remained until the collision. The speed of the brig is stated to have been from four to five knots; and as the wind, according to all the witnesses, was only moderate, there is no reason to believe it greater. In reaching the place of collision by a change of five points, the steamer diverged, as I have said, somewhere about 650 feet from her former course; the precise amount is immaterial. The brig, during the interval of a minute and a half, passed over somewhere from 600 to 750 feet, and tracing her backward a minute and a half, we should find her in a position to see both colored lights of the steamer abeam. This corresponds so entirely with the statements of the brig's witnesses, that they did see both colored lights of the steamer abeam, that their truth cannot be doubted. It follows, consequently, that when the steamer starboarded, so as to shut out her red light from the brig, the brig could not have been to any considerable degree on the steamer's starboard bow; but must have been nearly ahead. Under such circumstances, to starboard, in the endeavor to pass ahead of the brig's known course, instead of going astern, cannot be excused as a mere error of judgment. The steamer had only to continue her course and no danger would have arisen. Her starboarding was, therefore, a third fault; and upon these grounds the steamer must be held.

2. Two faults are alleged against the brig: *First*, that she did not blow her fog-horn; *second*, that she did not exhibit any flash-light as required by section 4234. I cannot disregard the testimony of the men on the brig, that a fog-horn was blown as soon as as they heard the whistles from the steamer, although the horns apparently were not heard. It is admitted that no lighted torch was exhibited. But though the statute requires a torch-light to be exhibited, it does not declare that the sailing vessel shall be answerable for a subsequent collision if she fail to exhibit it, without regard to the question whether her failure to exhibit it had anything to do with the collision or not. When it clearly appears, therefore, that the exhibition of such a torch could have done no good,—that is, could not have conveyed any additional information of any use to the steamer, and could have made no difference in the result,—the omission of it is immaterial. *The Leopard*, 2 Low. 238; *The John H. Starin*, 2 Fed. Rep. 100; *The Margaret*, 3 Fed. Rep. 870; *The Oder*, 8 Fed. Rep. 172. See *The Dexter*, 23 Wall. 76; *The Algiers*, 21 Fed. Rep. 345. The burden

of proof to establish this is upon the sailing vessel. This burden she has sustained in this case, because it appears that her red light was seen on the steamer in ample time to avoid her. A flash-light could have revealed nothing to the steamer in regard to the brig's position or course which she did not fully and seasonably know. It might have done harm by obscuring the brig's red light; and that would have caused evident embarrassment, while the failure to show a torch-light did not create any embarrassment to the steamer or withhold any useful information. There is no ground to suppose that the exhibition of a torch-light would have been followed by any different maneuver by the steamer, or that it would have made the slightest difference in the result. The failure to show it was, consequently, immaterial within the cases above cited, and was in no sense one of the proximate causes of the collision. *Spaight* v. *Tedcastle*, L. R. 6 App. Cas. 217, 219; *Cayzer* v. *Carbon Co.* L. R. 9 App. Cas. 873, 882, 886.

The libelant is therefore entitled to a decree with costs; and a reference may be taken to compute the damages.