## THE IRON CHIEF.

### WINEMAN v. THE IRON CHIEF.

(Circuit Court of Appeals, Sixth Circuit. May 21, 1894.)

No. 86.

1. COLLISION—STEAM AND SAIL — FAILURE OF STEAMER TO KEEP OUT OF THE WAY.

A steamer with a barge in tow, bound up the river Ste. Marie, to Lake Superior, when near the upper end of the river, saw a schooner in the bay, headed towards the entrance of the channel, beating northeasterly under a strong northwesterly wind, in such a position that, to enter the channel, she must make a sharp turn, and might need a good deal of sea room before she could get straightened down. The steamer was at a safe distance, with ample opportunity to prepare for passing. Her master, being uncertain whether the schooner intended to enter the channel or go up the lake, stopped, but, on seeing the schooner turning into the channel, went ahead with full steam, porting a little, into the jaws of the entrance, on the north side of it, reaching there just as the schooner was swinging into the opening. *Held*, that this was not a compliance with the rule requiring him to keep out of the way of the sailing vessel, and the steamer was liable for a collision between her and the schooner before the latter had completed her swing. 53 Fed. 507, reversed.

2. SAME—RIGHT TO NAVIGATE CHANNEL.

The schooner might have gone to the southward of the channel, through an open spread of shallower water, deep enough for her, through which vessels occasionally went, and thereby would have avoided risk of collision. *Held*, that she was not in fault in taking the well-known navigated channel. 53 Fed. 507, reversed.

3. SAME—CHANGE OF COURSE IN EXTREMIS.

The schooner, swinging into the channel with her helm hard a-port, changed it to starboard, almost at the instant of collision, for the purpose of easing the blow. *Held*, that this was not a fault. 53 Fed. 507, reversed.

4. SAME—TUG AND TOW.

After the collision between the schooner and the steamer, the barge in tow of the latter, on a line 600 feet long, not having been released in time to prevent her colliding with the schooner, struck the schooner a heavy blow. *Held*, that the steamer was liable for the damage therefrom.

5. ADMIRALTY—APPEAL—REHEARING.

A rehearing of an appeal in admiralty should not be granted on the ground of newly-discovered evidence of a fact not known to the petitioner, but which was known to the witnesses of the opposite party, and not disclosed by them, where no sufficient reason is shown why it was not ascertained and proved while the case was regularly open.

Appeal from the District Court of the United States for the Eastern District of Michigan.

This was a libel by Henry Wineman, Jr., against the steamer the Iron Chief (the Detroit Transportation Company, claimant), for damages by collision to libelant's schooner the J. F. Card. The district court dismissed the libel. 53 Fed. 507. Libelant appealed.

The libel in this case was prosecuted by the owner of the schooner J. F. Card, to recover for the damages sustained by that vessel from a collision with the respondent, the Iron Chief, and another collision, immediately following, with the barge Iron Cliff, in the steamer's tow; and the allegation of the libel substantially was that the collision was brought on by the fault and negligence of the steamer in not keeping out of the way. The answer denied that there was any fault on the part of the steamer, and charged that the fault was wholly with the Card, and chiefly in that she did not keep on the course she

had adopted prior to the collision, but suddenly, when the vessels were about to meet, ceased to pay off on her swinging course, and forged straight on upon the steamer's side, and thereby produced the collision complained of.

The evidence showed that, upon the coming together of the schooner and the steamer, the head booms, stem, and rails of the former were carried away, and several of her stanchions, her bulwarks, stringers, and deck beams broken. Upon the collision of the vessels the fore end of the schooner was carried about in the direction of the movement of the steamer, and, as she lay drifting in that situation, she was again struck on the starboard bow by the barge in tow of the steamer, and further damage was inflicted.

The accident happened between the buoys marking the channel at the upper end of the river Ste. Marie, where the waters descending from Lake Superior through Waiska bay begin to contract in the channel of the river. The Iron Chief was just steaming out of the channel into the bay, with the Iron Cliff in tow, on a line of about 600 feet. The Card was bound down from Lake Superior, and on the morning of the collision had been tacking about on sharp courses across the bay in search of a tug, and, not finding any, started to go down the river alone. All three vessels were loaded. The Card was 137 feet long; the other vessels were each 228 feet long; and the channel at the place of their collision was about 600 feet wide.

Upon the hearing in the court below, the district judge, being of opinion that the schooner was alone to blame for the collision, dismissed the libel. From that decree the libelant appeals.

Henry C. Wisner, for appellant.

John C. Shaw and Herbert A. Wright, for appellee.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

SEVERENS, District Judge, having stated the case generally as above, delivered the opinion of the court.

By the twentieth of the sailing rules prescribed by section 4233 of the Revised Statutes (article 17 of the revised international regulations; Act March 3, 1885), it is provided that, when a steamer meets a sailing vessel under circumstances where a collision is to be guarded against, the steamer is bound to keep out of the way of the sailing vessel; and when it is shown that she has not done so, and a collision has occurred, a presumption arises that the steamer was at fault. The Oregon v. Rocca, 18 How. 570; Steamship Co. v. Rumball, 21 How. 372; The Fannie, 11 Wall. 238; The Carroll, 8 Wall. 304; The Pennland, 23 Fed. 551. That presumption applies to the present case, and fastens the liability for the injury which occurred upon the steamer, unless it is shown that the accident happened, not through the disregard of the rule by the steamer, but in consequence of the violation by the schooner of the duty which devolved on her in the situation in which the respective vessels were, or by inevitable accident. The learned district judge held that the burden of proof imposed upon the claimants by the operation of the above-mentioned rule was sustained, and came to the conclusion, upon the testimony, that the steamer was not chargeable with fault contributing to the collision, which, as he thought, was solely due to the negligence and mismanagement of the schooner.

Under some circumstances, we would appreciate more fully the disadvantage we are under from being unable to see the witnesses and attend to their manner of delivering testimony; but in the present case there are certain leading facts about which there is no

serious dispute, and from which we think controlling inferences ought justly to be drawn.

We will first consider the conduct of the steamer. When her captain was first required to pay attention to the schooner, the steamer was moving up the channel in the middle or a little to the north side, a safe distance away, with ample opportunity to make the necessary preparation for passing. The weather was clear, and it was broad daylight. The schooner was over his port bow, well down in Waiska bay, bearing northeasterly under a strong northwesterly wind, and headed towards the entrance of the channel between the buoys, directly in front of him. He saw that she was "loaded deep," as he says, and he saw that she was so low down to the southeast in the bay that, as she came up to enter the channel, she must accomplish a sharp turn, and might need a good deal of sea room before she could make the turn and get straightened down, and he must have recognized her right to come down in such part of the channel as she found necessary. He was by his own account in this situation when he checked the speed of his engine, and then ordered it stopped, to enable him to see what the schooner was "intending to do," and to determine his own course,—a very proper precaution. Then, on seeing the schooner making preparations for turning into the channel, by taking down her mainsail and beginning to pay off from her course on a port wheel, instead of stopping or going slowly, as his situation permitted, until the schooner had come in and had taken her course down, he rang up the engine to put on full steam, ported a little, and moved up into the jaws of the entrance on the north side of the middle, reaching there just at the moment when the schooner was performing the most difficult part of her movement. We are of opinion that this was not a compliance with the rule which required him to keep out of the way of the sailing vessel. It was a case where, as it seems to us, he was bound to the utmost circumspection.

The measure of the obligation of a steamer when such danger of meeting exists is thus stated by the supreme court in The Carroll. 8 Wall. 302–306. Having referred to the rules prescribed for such a case, it is said:

"They require, when a steamship and sailing vessel are approaching from opposite directions, or on intersecting lines, that the steamship, from the moment the sailing vessel is seen, shall with the utmost diligence watch her course and movements, so as to be able to adopt such timely measures of precaution as will necessarily prevent the two boats coming in contact."

And in the case of The Falcon, 19 Wall. 75, the court again repeat the rule in the following language:

"It was the duty of the steamer to see the schooner as soon as she could be seen, to watch her progress and direction, to take into account all the circumstances of the situation, and so to govern herself as to guard against peril to either vessel." "The general tendency of the authorities is to enforce the duty of great caution and unremitting vigilance on the part of those engaged in the navigation of vessels propelled by steam." Ward v. Ogdensburgh, Newb. 139, 154, 5 McLean, 622, Fed. Cas. No. 17,158.

Evidence was offered to show that the captain of the Iron Chief was uncertain about the intentions of the Card when he first saw

her on her last course across the bay, his judgment rather inclining to the conclusion that she was going up the bay into Lake Superior; and it seems to have been supposed that this uncertainty might have some bearing upon the question whether he exercised due precaution in his movements. We cannot see in the evidence any good reason for the impression which he says he had. But, as he acknowledges that he was in doubt, a situation existed by his own confession into which he could not blindly run. But this is of little moment. It is perfectly clear that he was fully advised of the schooner's purpose to come down the channel while he yet had time to regulate his own course so that she could pass in safety. The statement in his testimony that, if he had remained where he was, a collision must have occurred, appears to us to have no foundation. By his own account, he was then some 1,200 feet below the entrance of the channel, and there was full opportunity for the schooner to have resumed her course before meeting him. We are therefore constrained to a different conclusion from that of the district judge, and hold that the steamer was in fault.

In respect to the conduct of the Card, we are unable to find sufficient ground for holding her blamable. The steamer being convicted of a plain violation of the legal rule, and thereby bringing on the collision, her countercharge that the other party was guilty of misconduct contributing to it ought to be clearly made out.

The principal grounds upon which the conduct of the schooner is censured by the court below and by the counsel at the hearing on appeal are two. The first in their order is that the schooner should have gone to the southward of the usually navigated channel, and passed through an open spread of shallower water, but yet deep enough for her, and through which vessels occasionally went. It is urged that she should have done this because she was so low down in the bay that it was difficult and might lead to embarrassment if she attempted to go up and turn nearly at right angles, as she must, into the channel, and that she was blamable for needlessly taking a course which invited risk of collision. We may observe in passing that this suggestion of a risk of collision re-enforces the charge of the libelant that the movement in which his vessel was engaged was of such a nature as to impose upon the steamer the duty of great caution. But it cannot be said that the schooner was in fault in taking the well-known navigated channel. It was the one marked out on the government chart and directions for sailing, and on the land and water by the beacons, stakes, and buoys placed there for the purpose of furnishing guides for navigation. The schooner had the same privilege to navigate the channel that the steamer had; and, while the situation was such as to require from both parties a careful attention to their respective duties, there was no such risk of collision, when she attempted to go down the channel, as to warrant the imputation that she was guilty of misconduct in claiming and exercising her common right, and she was justified in expecting from the steamer that she would carefully continue to watch the schooner's movements until all danger should be passed.

The learned district judge, in his opinion, which is printed in the record, held that there was nothing in the situation to make the passage hazardous, and in this we concur with him.

The other ground of censure taken in behalf of respondent against the Card, and one more strongly maintained than any other by counsel for the claimant, is that the schooner did not observe the duty which belonged to her, in that she did not keep her course, as she was bound to do by the twenty-third rule of section 4233, Rev. St. (article 22 of the regulations of March 3, 1885). This rule, while it has more general application to vessels standing on a direct course, yet undoubtedly applies to one moving on a circular or swinging course, under circumstances where it may reasonably be supposed that the swinging is intended to be for a time maintained until the general course of the vessel can be resumed. And the rule itself is subject to such modification as the necessities of navigation require. In the case of The John L. Hasbrouck, 93 U. S. 405, which arose from a collision on the Hudson river between a steamer coming up and a sloop going down, Mr. Justice Clifford, in discussing the application of the rule in regard to sailing vessels navigating a channel where it is necessary to go around the projections from the banks or avoid any other impediment to a straight course, or when from any other cause deviations are necessary, says:

"Variations of the kind in the course of the vessel are allowable, because they cannot be avoided without imminent danger of immediate destruction; nor is a sailing vessel under such circumstances forbidden to yield to such a necessity, even though those in charge of her deck are aware at the time that a steamer is coming up the river on a course which involves risk of collision, if it appears that a change of course is reasonably necessary to prevent the sailing vessel from running into the bank, or encountering any other natural obstruction to the navigation. Necessary changes made in the course of the voyage to avoid such obstructions are not violations of the sailing rule which requires the sailing vessel to keep her course whenever an approaching steamer is required to keep out of the way."

In the present case, the schooner, having a right to shape her course towards such portion of the opening of the channel as she should find necessary or convenient in order to go down, and expecting the steamer to look out for her movements and keep out of the way, took down her mainsail, put her helm hard a-port, and swung off to starboard. The extent to which she was swinging was presumably watched and estimated by the steamer. The latter then moved rapidly up the channel, and, going somewhat to the northward of the center of the channel, passed directly across the bows of the schooner, and almost at right angles with her. It is charged that the schooner, although for a time she swung or paid off as she should in order to get by, yet, when the steamer was almost passing, suddenly ceased to swing off, and, starboarding her helm, forged ahead into the steamer. There is a degree of improbability in this proposition which makes it dubious. It is difficult to believe that the captain of the schooner, being on a safe course to pass the steamer, and with no peril to disturb his judgment, should have adopted a maneuver which would inevitably bring him into disaster. It is true that, after the schooner's helm was put hard a-port, it was changed to starboard. The captain of

the schooner testified that this was done almost on the instant of collision, for the purpose of easing the blow by turning the head of his vessel in the direction of the movement of the steamer. Other witnesses corroborate this account of the matter, and there is no testimony of sufficient moment to justify us in coming to the conclusion that the captain's statement is not true, confirmed, as it is, by the moral probability that he would not have done so wanton and senseless a thing as that wherewith he is charged. It is not claimed that, if the starboarding was done at the time and for the purpose stated by the captain of the schooner, any fault could be found. It was in extremis, and, besides this, had no effect in producing the collision, and probably lessened the injury.

The other blow from the barge seems to have been altogether needless, if the proper measures had been seasonably taken. The captain of the Chief says that, when he saw the danger of collision, he ordered the towline cut. If he is not mistaken as to the time of giving this order, we are satisfied its execution was delayed. It was cut at some time. The witnesses differ as to the time, some saying it was about concurrent with the collision with the steamer, others fixing it at about the time the barge struck the schooner. We are satisfied that the latter is near the fact. The barge traveled 600 feet after the first collision, and delivered a heavy blow upon the schooner. If the barge had been released promptly, as she was going up the current, her speed would have been much reduced, and she could also have been made free to direct her own course away from the schooner. Be this as it may, the damage shown was all the legitimate consequence of the prime error, which was not in any degree alleviated before the end.

We think the libelant is entitled to recover for the injury complained of. The decree should be reversed, and the cause remanded to the district court, with directions to ascertain the damages and enter the proper decree thereon in accordance with this opinion.

### On Rehearing.

(July 3, 1894.)

The first and second grounds of the petition involve questions which have already been fully argued by counsel and considered by the court.

The third and only other ground is that evidence has been discovered since the original hearing which it is claimed bears strongly against the libelant's claim that his vessel was free from fault. This newly-discovered evidence consists of statements made by affidavits showing that there was a fault in the steering apparatus of the libelant's vessel which was not known to claimant, and of which the libelant's witnesses made no disclosure, although they knew of it when they gave their testimony. We think that the allowance of the petition for rehearing in such circumstances and for such reasons would set a mischievous precedent, would encourage negligence in the preparation of causes for hearing, and would embarrass the court with applications for rehearing of causes once fully considered and disposed of. No sufficient reason is seen in the present case why, if the fact be as claimed, it should not have

been ascertained and proven while the case was still regularly open to proof. It is shown by the petition that the attention of the claimant and his proctor had been seasonably drawn to the matter to which the newly-discovered evidence relates.

The petition is denied.