## THE ARDANROSE.

(District Court, S. D. Alabama. March 4, 1902.)

No. 936.

1. COLLISION—STEAMER AND SAILING VESSEL—BURDEN OF PROOF.

In case of collision between a sailing vessel and a steamer the presumption of law is that the steamer was in fault, and she has the burden of proof to establish the misconduct of the sailing vessel and her own proper navigation, or that the collision resulted from inevitable accident.

2. SAME—EVIDENCE CONSIDERED.

When a steamer was coming up the channel in Mobile Bay, she sighted a schooner about 1½ miles distant on a tack which would take her across the channel. The wind was light, and the schooner was not making more than two miles an hour. The schooner did not change her course, and, as she was crossing the channel, which was about 200 feet wide, she was struck by the steamer. The day was clear. *Held*, on the evidence, that no fault was shown on the part of the schooner, which had an equal right with the steamer in the channel, and that the fault was entirely that of the steamer, which might have avoided the collision by the exercise of proper care, and was in duty bound to do so.

In Admiralty. Suit for collision.

Stevens & Lyons, for libelant.
Pillans, Hanaw & Pillans, for claimant.

TOULMIN, District Judge. This is a libel for damages alleged to have resulted from a collision by the steamship Ardanrose with the schooner Josie Johnson, which is owned by the libelant. The collision occurred on January 9, 1901, in the channel of Mobile Bay, and near light No. 14. The schooner was beating up the bay with a light north or northwest wind. The steamer was also coming up the channel. The schooner was tacking, and came into the channel from the west side, heading to the east. The steamer was below the schooner, and heading north.

There is some conflict in the evidence, as is usual in cases of collision, but it is not so sharp or material as to make it very difficult to arrive at the substantial facts of the case. It appears from the evidence without conflict that the collision occurred between 8 and 9 o'clock in the morning; that the day was bright and clear; that the wind was light, or, as some of the witnesses express it, "a moderate breeze"; that it was from the north or west of north; that when the steamer and schooner sighted each other the schooner was west of the channel and the steamer some distance down the channel; that at the time of the

¶ 1. See Collision, vol. 10, Cent. Dig. §§ 54, 257.

collision the schooner was in the channel heading eastward or northeast across the channel, and that the port bow of the steamer struck the starboard bow of the schooner, and knocked a hole in the schooner, and otherwise injured her. There is some conflict in the evidence as to the location of the schooner in the channel. Three witnesses for libelant, who were members of the crew of the schooner, and who were on deck of the schooner at the time of the collision, testify: That the schooner was becalmed at the time of the collision, and had been lying totally unmanageable for about half an hour, as stated by two of said witnesses, and for at least 10 minutes, as stated by the third witness. That the schooner kept on her course when she entered the channel and until the wind suddenly died out. That when she made her last tack she was about a half mile to the west of the channel. After she tacked, her course was about northeast. The wind was very light, and the schooner was making about a mile and a half or two miles at most. One of said witnesses testifies that the schooner was about the middle of the channel, and another that she was two-thirds across the channel, heading northeastward. That they first saw the steamer two or three miles down the channel; when lying in the channel, and they saw the steamer coming ahead, they put the schooner's helm down, and tried to tack her, but she would not "stay." They had no wind. The steamer was a mile or more off at that time, and continued to come on. That they made signals to her, and when she came near enough they called to her. The steamer whistled twice, but continued to come ahead. Her speed at that time was, in the opinion of these witnesses, four or five miles an hour. It had been at least six or seven miles when they first sighted her. After the second whistle the steamer slowed down to about four or five miles an hour. Was then very near the schooner,—perhaps not over 40 yards. She struck the starboard bow of the schooner, and swung her around alongside the steamer, which passed on up the channel to the eastward of the schooner. That the channel is about 200 feet wide at the top, and the depth of the water on the outside of the channel is about 14 feet. That the schooner is 50 or 60 feet long, and that there was sufficient room for the steamer to have gone astern and westward of the schooner without getting out of the channel. There was proof that the cost of the repairs of the schooner was $1,098, and the value of her services during the time she was undergoing repairs was at least $25.

The captain of the steamer testifies on behalf of claimant: That the day on which the collision occurred was a bright, clear day. That after he first sighted the schooner he ran about a mile and a half or two miles before reaching the point of collision. That when he first saw the schooner she was about one and a half or two miles northwest of his ship, and about the same distance from the channel. That the schooner was heading towards the channel almost at right angles to it, and the breeze was moderate. That the schooner was just inside the west bank of the channel at the time, the steamer struck her, and was making more headway at that time than his ship was. When about one-half mile from the point of collision, the speed of his vessel was reduced from half speed to slow speed, and when in 50 or 60 feet from the schooner the engines of his vessel were reversed, and when she

struck the schooner she was almost stopped. He says he did not run astern of the schooner because he would have gone aground on the west bank of the channel. That the schooner was rather close to the west bank. The draught of his vessel was about 13 feet 1 or 2 inches, her register about 1,400 tons, and the bay outside the channel 11 or 12 feet. He says that at the time he reduced his speed from half to slow speed the danger signals were blown, and that he did not reverse his engines sooner because he thought that the schooner would get out of the way; that the schooner had time after the blowing of the danger signals to bear away from the channel and keep clear of the steamer. The steamer had no cargo aboard, but was water ballast. The chief officer of the steamer also testified for claimant: That he saw the schooner seven or eight minutes before the collision. That she was then a little more than a quarter of a mile west of the channel, standing about east-northeast on the starboard tack. That she did not change her course. That she was crossways in the channel at the time the steamer struck her. There was room to go astern of the schooner. The steamer would have gone ashore because of her depth. The breeze was light, but strong enough to keep a small boat under way. The schooner was under way when she was struck. The third mate of the steamer, a witness for claimant, testifies: That he was on the bridge of the steamer when he first saw the schooner about 1½ miles off to the west of the channel, heading nearly east on the starboard tack, standing about right angles to the channel. She was going about two miles an hour. When the steamer was about 200 yards from the point in the channel to which the schooner was heading, the pilot blew the danger signal. He saw from the schooner no indication of notice of the signal nor change in her direction. The engines of the steamer were then slowed down, and when they approached nearer the schooner were put full speed astern. The schooner was almost in the middle of the channel,—a little to the east of it. That the schooner was under way when she was struck. That the schooner and the steamer were about the same distance from the point of collision when he first saw the schooner. The steamer was then making about nine knots. The speed of the schooner when she entered the channel was about two miles an hour. That there were several men on the deck of the schooner, where they could plainly see the steamer at all times, and he saw them do nothing to alter the course of the schooner before the collision occurred.

Where a sailing vessel and a steamer collide, the presumption of law is that the steamer is at fault, being required to keep out of the way; and nothing but inevitable accident or the misconduct of the sailing vessel can overcome this presumption, and the fault of the sailing vessel must be clearly proven by the steamer. The fact of the collision being shown, the burden of proof is on the steamer to show the prudence of its own conduct and the negligence of the other. Where there is no decisive fault on the part of the sailing vessel, the steamer must answer for the collision. Prima facie, it is at fault. Rev. St. U. S. § 4233; The Iron Chief, 11 C. C. A. 196, 63 Fed. 289; Spencer, Mar. Coll. § 93. The supreme court, in The Carroll, 8 Wall. 302, 19 L. Ed. 392, referring to the navigation rules, said:

"They require, when a steamship and a sailing vessel are approaching from opposite directions, or on intersecting lines, that the steamship, from the moment the sailing vessel is seen, shall with the utmost diligence watch her course and movements, so as to be able to adopt such timely measures of precaution as will necessarily prevent the two boats coming in contact."

And in The Falcon, 19 Wall. 75, 22 L. Ed. 98, the supreme court said:

"It was the duty of the steamer to see the schooner as soon as she could be seen, to watch her progress and direction, to take into account all the circumstances of the situation, and so govern herself as to guard against peril to either vessel."

"The rule gives the right of way to a sailing vessel as against a steamer, and requires the steamer to keep off the course of the sailing vessel if it is practically possible to do so; that is, if she can do so without accident, such as collision with another vessel, running aground, or the like." The Marguerite (D. C.) 87 Fed. 953.

Has the burden of proof imposed by law on the steamship been sustained? Has it shown affirmatively the prudence of its own conduct and the fault of the schooner? Without endeavoring to reconcile the conflict in the evidence as to whether the schooner, at the time of the collision, was going ahead or lying becalmed and unmanageable in the channel; the conflict as to her exact location in the channel, whether in the middle of the channel, a little to the east of it, two-thirds across it towards the east, or close to its west bank; the conflict as to whether the crew of the schooner made any effort to get out of the way of the steamer and to avoid the collision, or gave any indication or warning of a helpless condition,—my opinion is that the steamer fails to meet the burden of proof which rests on her; that she not only fails to show diligence in adopting such timely measures of precaution as would have prevented the collision, and to show misconduct or fault of the schooner, but that the testimony of the captain and other witnesses for the steamer, if it correctly states the facts, clearly shows that it was practically possible for the steamer to have kept out of the way of the schooner, and to have avoided the collision, without accident to herself, such as collision with another vessel, running aground, and the like. It seems to me that the testimony referred to shows that the steamer had three courses she could have pursued and kept out of the way of the schooner. It shows that when the steamer first sighted the schooner she was a mile and a half or two miles from the point of the collision, and that the schooner was the same distance from it on the west of the channel, and was on her starboard tack, heading almost at right angles toward the channel; that her speed was 1½ or 2 miles an hour, and that of the steamer 9 knots (according to the mate's testimony). The other witnesses for the steamer do not state her speed at that time, but say when they subsequently gave the danger signals she slowed down to half speed. Now, if the steamer had kept on her course at the same speed she was going, she would have passed the point of the collision long before the schooner reached there. They had the same distance to travel, and the steamer, at three or four miles an hour, would have reached the point in half the time it took the schooner to get there. Again, if these witnesses are mistaken as to the distance the respective vessels were from the point

of the collision or as to their speed, but the captain and first officer of the steamer are correct in stating that the schooner when she was struck was under way,—at least steerageway,—and was going ahead nearly as fast as the steamer was, and was close to the west bank of the channel, then by reversing or stopping the steamer's engines or reducing her speed to steerageway only at the time she reduced her speed from half to slow speed, which they say was about one-half mile from the point of collision, the schooner would have had ample time to have crossed the channel and gotten out of the way. The captain gives no reason for not doing so, except that he thought the schooner would get out of the way when he blew the danger signal. Moreover, if the schooner was close to the west bank at the time of the collision, no reason is shown why the steamer could not have passed on the eastward of her without colliding with her. It appears that the channel was 200 feet wide at the top. The schooner was between 50 and 60 feet long. It does not appear from this testimony that she extended one-half way across the channel. Where, then, was the danger of the steamer going aground on the east bank? I am not informed as to the width of the steamer, but it could not have been as much as 120 feet, or even 100 feet. There was something said by the claimant's counsel in argument to the effect that the steamer could not have reversed her engines or stopped when she first saw the danger of a collision and signaled the schooner, because she might have collided with the dredgeboat Bismark, which was in the channel below; but I find nothing in the testimony to support that suggestion. There was nothing about the dredge Bismark in the testimony for the claimant; and in that for the libelant it does not clearly appear how far the Bismark was lying from the point of collision. One witness stated it was a mile, another that it was several hundred yards. It is, however, clear that it was a considerable distance beyond where the steamer blew her danger signal, and beyond all danger of a collision with it. The real ground on which the schooner is charged with misconduct or negligence by the claimant is that, when the danger signal was blown, she did nothing to get out of the way of the steamer, and that she should not have entered the channel at all; that she was blamable for needlessly taking a course which invited risk of collision; that she should have kept on the west of the channel, and passed through an open spread of shallow water, but deep enough for her. A like contention was made in the case of The Iron Chief, supra, and the court said: "But it cannot be said that the schooner was in fault in taking the well-known navigated channel. * * * The schooner had the same privilege to navigate the channel that the steamer had." My opinion is that there was no such risk of collision when the schooner was on her starboard tack, and attempted to cross the channel (quoting the language of the court in The Iron Chief), "as to warrant the imputation that she was guilty of misconduct in claiming and exercising her common right, and she was justified in expecting from the steamer that she would carefully continue to watch the schooner's movements until all danger should be passed." My opinion further is that the steamship was wholly at fault.

A decree will be entered for the libelant for $1,212.84.