THE SHAWMUT. THE T. MORRIS PEROT. SOUTHERN S. S. CO. v.
RANDOLPH et al.

(District Court, E. D. Pennsylvania. November 11, 1919.)

Nos. 70–72, and 97.

1. COLLISION ⊘⇒43, 44—DUTY OF STEAM VESSEL TO AVOID SAILING VESSEL.

When a steamer and sailing vessel are on courses which cross, the
duty is imposed on the steamer to alter her course, if this will avoid the
danger of collision, and the sailing vessel is bound to hold her course, and
the only justification for nonobservance of this rule is some danger of
navigation, or some emergency which forbids observance.

2. COLLISION ⊘⇒49—BURDEN OF PROOF ON STEAM VESSEL COLLIDING WITH SAIL-
ING VESSEL.

Where a steamer admitted seeing some two miles away a schooner,
which was approaching on a course that would cross, and the vessels col-
lided, the steamer, in view of the navigation rules requiring it to avoid the
collision, practically has the burden of proving that the collision occurred
despite its observance of the rules.

3. COLLISION ⊘⇒18—NEGLIGENCE CONTRIBUTING TO INJURY.

Negligence with which the law maritime concerns itself, as in the case
of the law of negligence everywhere, is not negligence, but negligence
which contributes to the injury done; and hence a vessel is not liable for
negligence which did not contribute to the collision.

4. COLLISION ⊘⇒45—FAULT AS BETWEEN STEAM AND SAILING VESSELS.

Where a steam and a sailing vessel, proceeding on courses which would
meet, collide, held that, under the circumstances, the steam vessel, which
was bound to avoid the sailing vessel, was solely liable, being negligent
in failing to give the sailing vessel space in which to safely pass, and the
sailing vessel not being negligent in an attempt to change its course when
it appeared that a collision was imminent.

In Admiralty. Libel by William F. Randolph, master and part own-
er of the schooner T. Morris Perot, on behalf of himself and the other
owners of said schooner, and on behalf of himself and other members
of the crew, against the American steamer Shawmut, together with a
libel by William F. Randolph, late master of the schooner T. Morris
Perot, against the American steamer Shawmut and against the own-
ers of the schooner T. Morris Perot, together with libel by Stephen
Olsen, late mate on board of the schooner T. Morris Perot, against
the American steamer Shawmut and against the owners of the schoon-
er T. Morris Perot, together with a libel by the Southern Steamship
Company, owner of the steamship Shawmut, against William F.
Randolph and others, owners of the schooner T. Morris Perot. Sur
trial hearing on bill, answers, and proofs. Libels against the steamer
Shawmut sustained.

Howard M. Long, of Philadelphia, Pa., for Randolph and Olsen.

H. Alan Dawson, Biddle, Paul & Jayne, and M. Hampton Todd, all
of Philadelphia, Pa., Proctors for owners of the Shawmut and the T.
Morris Perot.

DICKINSON, District Judge. These cases all grow out of the
same occurrence. This occurrence was the collision of the steamer

⊘⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Shawmut with the three-masted coasting schooner T. Morris Perot on the night of September 28, 1913. The collision occurred just south of Fenwick Island Lightship, in the Atlantic Ocean, off the Delaware coast. A libel was filed by the schooner, and a cross-bill by the steamer. There are libels also by the master and crew of the schooner for personal injuries.

The facts of this collision called forth comments at the argument from the proctors of the respective parties, which each in its way fitly presents the general aspect of this case. One was to the effect that the question presented was whether the broad Atlantic was wide enough to enable two vessels to pass each other in safety when each had a clear view of the approach of the other for a distance of nearly, if not quite, three miles. The other was the statement that this collision could not have occurred without the grossest negligence on the part of one of these vessels or both.

In view of the latter statement, as each is seeking to put the blame upon the other, the easy solution of the problem is suggestive of a finding that they were both to blame. However easy this may be, it is not a satisfactory solution, without more light being thrown upon what led up to the collision.

In getting at the truth of the responsible causes of happenings on the water, the inquirer is hampered by certain inbred and ineradicable predilections and prejudices and traditional feelings, with which those who follow the water are imbued. One which has often been observed is that every one on a boat identifies himself with his boat, and is quite as slow to admit the blame to be there as the ordinary man is to admit the fault to be his. Another is the class feeling which is aroused and always manifested. The navigator of every steamer looks upon the navigators of sailing vessels as the personification of careless and reckless management. He is not only prepared to believe, he assumes it to be the fact, in every case of collision of steamer and sailing vessel, that the latter was being navigated in disregard of every rule of navigation, and of everything except what pertained directly to the handling of the vessel. Sailing masters retort in kind, and are in their turn ever ready to believe that steamers have no regard for the safety of sailing vessels, and refuse to recognize the right of the latter to navigate the same waters with themselves. These opposing attitudes and points of view are sure to produce conflicts of testimony in every litigation. The impartial inquirer must perforce find a viewpoint of his own, and hold every one to the observance of the rules and regulations which are laid down for the common good and for the guidance of all.

[1] To find a beginning for the inquiry to be made, we start with the proposition that, when steamer and sailing vessel are on courses which cross, the duty is imposed upon the steamer to alter her course, if this will avoid danger of collision, and, in order that this rule may accomplish its purpose, the correlative duty is imposed upon the sailing vessel to hold her course. The only justification for nonobservance of this rule is some danger of navigation, or some emergency, which forbids observance. When, therefore, as here, there was no justification for a departure from this rule of action, other than some sudden emergency,

and no explanation which accounts for what occurred, except neglect of the rule, the inquiry is narrowed to the point or points indicated.

[2] The finding is made of the fact, before intimated, that under the conditions existing the lights of the schooner could be made out at a distance of nearly, if not quite, three miles, and those of the steamer at a greater distance. This fact compels the inference that the rule adverted to was disobeyed or there would have been no collision, and as the primary duty of the steamer was to be outside of what may be called the zone of collision, it practically imposes upon the steamer the burden of causing it to appear why the collision occurred, if the steamer observed the rule.

This burden the very fair and capable proctor appearing for the steamer recognizes and assumes, and is ready with an explanation, which is clear and intelligible in its statement, and the theory of it is consistent with all the facts which are not in dispute. The theory is met, if at all, by the version of the disputed facts which is given by the master and crew of the schooner.

[3, 4] There is a minor fact which has some bearing upon the main fact to be found. This relates to the relative speeds of the two vessels. The schooner was running free before a fairly fresh breeze, and was running almost dead before the wind. She was making about nine knots an hour. The steamer was making about the same speed. Some question has been made of when the steamer made out the schooner's lights. All question as to this is resolved by the admission, frankly made on behalf of the steamer, that she made out the lights in ample time to enable her to so maneuver as to avoid the collision.

The theory of the steamer begins with the averment of the fact that she had notice of the presence of the schooner when the vessels were a mile apart in distance and between three and four minutes in time. The next fact averment is that the schooner showed a red light only. The schooner, in its general direction, was bound south; the steamer, north.

The conditions named indicated that the vessels were passing on converging lines, and that if both vessels held to their courses they would collide, or that the steamer would cross the bows or cross astern of the schooner. These conditions further dictated that the steamer should pass under the stern of the schooner, and to assure this should port her helm.

The next averment of fact is that the steamer did port her helm, and further that she slowed her engines, and followed this (as will later appear) by reversing them. The assertion is confidently made that the effect of what was done was to turn the course of the steamer to the eastward and away from the course of the schooner, and that if the schooner had held her course, as she was expected to do, and as it is further asserted was called upon to do, the vessels would have passed in safety. On this theory, what occurred is accounted for by averments of what was done by the schooner.

Up to the time the steamer's helm was ported, the schooner, as before stated, was showing a red light. Almost at that moment the red light disappeared and a green light was shown. This meant collision, or grave danger of it, because it meant that the schooner was being

thrown athwart the course of the steamer and right under her bows. It was then the engines were reversed. The conditions immediately after the collision which then occurred are said to bear out the theory thus outlined. Before a change of course on the part of either vessel, the steamer bore off the schooner's port bow. If there had been a collision under these conditions, the steamer would have struck the schooner on the latter's port side. When the collision did occur, the schooner was struck on her starboard side, and finally was directly across the bows of the steamer. This position of schooner and steamer could not possibly have been brought about, except by a changing of the course of the schooner to the eastward.

All this is entirely clear, and is further confirmed by the statements made by the master of the schooner after the collision. The judgment would rest satisfied with the finding indicated, except that the query might enter and linger in the mind why the schooner was guilty of such gross negligence as is implied in this version of the facts.

The theory of the steamer has ready the required explanation. It lies in the following facts: The schooner was short-handed. As a consequence, she had no lookout during the mate's watch. The watch was about being changed when the collision occurred. The schooner had been, as before stated, running before the wind and was winged out. The wind was hauling around to eastward, and coming more and more from that quarter. It came in puffs, and each puff was little more from the east than the one before it. When the master came on deck to relieve the mate, he came a while before the mate's watch was up. He saw that it would be necessary to change the sails. This involved jibing the spanker from port to starboard. He decided to do this then, and not wait. He was getting ready for this as the steamer approached, and did it at about the time the steamer shifted her helm. The helm of the schooner was put to starboard to assist in this maneuver, thus bringing her head to port, or this was brought about by the heavy sail swinging over to starboard and filling. In doing this the master did not know of the proximity of the steamer. This was due to the absence of a lookout forward, and that the schooner's sails prevented the man at the wheel and any one who was aft seeing anything dead ahead. If the steamer had been made out before this, its presence was forgotten for the few minutes the jibing was being done.

It must be admitted that what happened might have happened as described, and that this theory plausibly accounts for conduct on the part of the schooner which otherwise might be thought unaccountable. and that the theory is consistent with all the facts so far disclosed. The theory, because of this, can be combated only by the disclosure of other facts, or by the successful denial of the truth of the fact statements on which it is based. The schooner thus meets the steamer's theory. This new fact situation and changed fact situation are disclosed by the schooner's version of what occurred. That version is as follows:

The steamer's theory has been first stated, because it was in the development of the trial the first to be given, and for this reason the schooner's case was in large part in the form of an answer to the theory thus set up. In giving the story of the collision put forth by the schoon-

er, we will indicate the points of conflict between the two accounts. In order to do this, it will be recalled that the picture drawn by the steamer of the lines of approach of the two vessels showed converging lines with such a sharpness of angle that the red light of the schooner was opposed to the green light of the steamer, the schooner showing off the steamer's starboard bow, and the steamer off the schooner's port bow, and that the speed of each was nine knots. This was accompanied with the statement, as indeed the theory itself implied, that these were the only lights shown because of the angle of approach. There is agreement only upon the speed, and the fact that the green light alone was seen by the schooner. According to the version of the latter, the vessels were approaching almost exactly head on. All the witnesses for the schooner place the steamer slightly on their starboard bow, except the master, who placed her a little off the schooner's port bow, but practically dead ahead. The masthead lights of the steamer were made out when she was perhaps seven and at least five miles away, and these indicated that she was headed almost directly for the schooner. Each vessel changed her course slightly, but these changes had no bearing upon the collision and did not change the line of approach.

Just here appears the first difference between the accounts. As both the schooner's lights were unquestionably burning, if her account is correct, both lights should have been made out by the steamer, and the only explanation of the fact that the steamer showed no red light is that this light was not burning.

We will not take the space to attempt to reconcile these differences, because, as we view it, neither the absence of the red light, if it was absent, nor whether the vessels were holding the same course in reverse or converging courses, affects the question of who was at fault. The absence of the red light (we say again if it was absent) did not mislead the schooner, and this difference as to the courses of the approach made no difference in the result that the vessels met, and did not alter the duty of the steamer to keep out of the way of the schooner, nor in any way interfere with the steamer passing the schooner port to port. The only possible bearing it has upon what happened, and upon the steamer's theory of why it happened, is that the final swing of the schooner to port was less of a swing, if the schooner's statement of the approach courses is accepted, than if that of the steamer is correct. The difference is only an illustration of the hopelessness of the expectation that those on board of vessels complaining of each other will ever see anything alike.

There is another difference of a like small value. The steamer did not make out the schooner until she was within a mile or three-quarters of a mile. The schooner avers the steamer should have seen the schooner's lights for three miles, or at least two. It is asserted that these facts convict the steamer of negligence, because they argue the absence of a proper lookout.

The Carroll, 75 U. S. (8 Wall.) 302, 19 L. Ed. 392, and other cases, are cited in support of this proposition, and it is very confidently urged that the failure to keep a proper lookout was the proximate cause of the collision. It is to be observed, however, that the negligence with which

the law maritime concerns itself, as does the law of negligence everywhere, is not negligence, but negligence which contributes to the injury done.

The finding made is that the steamer made out the schooner in ample time to get out of her way. This the steamer admits. It follows that the proximate cause of the collision, if the steamer was responsible, was in the failure to avoid the schooner, and not in the failure to discover where she was.

There is, however, another difference in the accounts given which is important, if not controlling. It will be further remembered that the theory of the steamer was based upon the fact that the schooner changed her course in the act of jibing her spanker in ignorance or momentary forgetfulness of the proximity of the steamer. It is this which gives plausibility to the theory. The schooner meets the theory with a denial of this vital fact upon which it is based. The schooner had been running free, with her mainsail and spanker booms over the port rail. The wind, as before stated, had been hauling more and more around, and was coming in puffs; each succeeding puff coming more from the east. The master had in mind to set these sails wing and wing. He deferred this first until the change of watch at 4 o'clock, and he says he further deferred it because of the nearness of the steamer and his fear that the maneuvering of the schooner might confuse the steamer. The crew jibed the mainsail over without waiting for him. It was a small sail compared to the spanker, carried no topsail, and being blanketed by the spanker, could be easily handled. This put the mainsail boom over the starboard rail and left the spanker to port; the schooner after that sailing wing and wing. The wind continuing to haul around to the eastward, the master had in mind to jibe the spanker over also, but did not do so for the reason stated. The steamer all this time was, as he saw her, dead ahead. He held the schooner steady on her course in obedience to the well-known rule, and kept her so until the steamer was so close that a collision was inevitable, and then, in order to ease the shock, by receiving a glancing instead of a head-on blow, he ordered the helm put to starboard. The collision came so soon that the witnesses for the schooner all testify that the schooner did not have time to feel her helm.

Right here is a very significant fact to be found, all the circumstances affecting which should have been developed more fully than they have been. Was the spanker left over the port side, as it had been, or was it being jibed at the time of the collision? It was a large and heavy sail, and had above it and as part of it a big topsail. With such a wind as was blowing, no one would have thought of jibing over such a heavy sail all standing. Something would have carried away. Before the jibing was done, the peak would have been lowered, and this would have required the taking in and resetting of the topsail, and the sheets would have been hauled home and eased off as the boom went over.

We have no evidence of anything having been done in preparation. On the other hand, at least, just after the collision and as the immediate result of it, the bows of the schooner were turned so far to port that

the spanker must have jibed then, if it had not before. What happened when that heavy sail and boom, with loose sheets, went sweeping over the deck in a full half circle from port to starboard? We are not told anything, except the casual remark that "the spanker went over," and "the force of the blow broke the hook and the spanker went over"; "the spanker jibed over after" the collision, etc. It may be, of course, that the attention of every one was so taken up by the collision that the particulars of nothing else were specially noted. These particulars were not more fully developed at the trial, because the issues did not at the time clearly appear. The testimony of the witnesses on behalf of the steamer had been taken by depositions, as was that of all the witnesses for the schooner, except that of the master, so that the trial was nothing more than the taking of his deposition. In consequence, the significance of this branch of the case did not then present itself. All the testimony, however, so far as it goes, goes to the establishment of facts which destroy the steamer's theory, because they go to the other fact that the turning of the schooner to port, so far as she did turn, was not the result of the jibing of the spanker, and that the changing of course, so far as there was any, was prompted by the necessities of an emergency which forbids any finding of negligence on the part of the schooner or the imputing to her of any blame for the collision.

There is no doubt that the steamer ported her helm, and it may be (although this finding we cannot make) that she would have cleared the schooner if the latter had held her course, and it may further be that the schooner used bad judgment in putting her helm to starboard. The judgment exercised, however, was under the evidence a hasty judgment, forced upon the schooner by the steamer, and although bad judgment, or even a mistake in judgment, may be evidence justifying a finding of negligence, it will not justify such finding when it is excused by an emergency created by the negligence of the one who makes the complaint of bad judgment.

We are influenced in reaching the conclusion we have reached by the fact that the steamer should have made out the schooner in ample time to have moved outside of what we have called the zone of collision, and did see the schooner, as is admitted, in time to keep out of her way. The collision nevertheless occurred, and the steamer can escape a finding of culpability only by the facts, making it clear that the collision occurred through some cause other than failure in her duty to give the schooner sea room.

In every one of the long line of cases to which we have been referred by the proctor for the steamer in his clear and very helpful discussion of this case, it will be found that the sailing vessel, held responsible for collision with a steamer, had changed her course, not because of necessity, born of some danger of navigation, or of some emergency decision forced upon her by the negligence of the steamer, but because she unexpectedly changed her course wholly for her own convenience, or to get some benefit or advantage which might have been deferred until the danger of collision was past.

The findings of fact made and conclusions reached are:

1. The steamer Shawmut was wholly to blame for the collision, in

that it was brought about by the negligence of the steamer in not giving the schooner sufficient space in which to safely pass.

2. The schooner was without blame for the collision, in that she was guilty of no negligence; the error of judgment in putting her helm to port, instead of holding her course, being the result of a sudden impulse itself resulting from the negligence of the steamer.

3. The several libels against the steamer should each be sustained, and the libelants recover their respective damages, with costs.

The conclusion reached is supported by all the cases, among which the following, taken more or less at random from the briefs submitted, are cited as sufficient authority for the ruling made: The Nacoochee, 137 U. S. 330, 11 Sup. Ct. 122, 34 L. Ed. 687; The Oregon, 59 U. S. (18 How.) 570, 15 L. Ed. 515; The Carroll, 75 U. S. (8 Wall.) 302, 19 L. Ed. 392; The Ardanrose (D. C.) 115 Fed. 1010; The Truro (D. C.) 35 Fed. 317; The Potomac, 75 U. S. (8 Wall.) 590, 19 L. Ed. 511; The Illinois, 103 U. S. 298, 26 L. Ed. 562; The Europa (D. C.) 116 Fed. 696.

We have discussed the case without reference to the conversations aboard the Shawmut. There is little real dispute as to what they were. The master of the schooner, it is true, makes a denial; but this is more to the stated effect of what was said than of what was said. When rightly interpreted, what was then said was what was testified at the trial in every substantial respect. The schooner did put her helm to starboard. The captain had for his schooner the love of a parent for his child. In his grief over her loss he regretted everything that had happened. This included what he had done. He was, of course, in doubt about doing it; but after he had done it the reason he gave for not undoing it was a good one, and the reason he gave for doing it was the same he gave at the trial. We see no real conflict between his statements and his testimony, which reflects upon the latter.

The finding against the steamer is forced by what it did and omitted to do by its own admissions. It made out the schooner, but did not soon enough move to get out of the danger zone.

We have ruled all questions upon which we have been asked to rule at this time.

The libels against the steamer are sustained.