# THE STIFINDER.

## Petition of ACTIESELSKABET CHRISTIANSAND.

(Circuit Court of Appeals, Second Circuit. July 18, 1921.)

No. 168.

1. **Collision ⬅︎77—Steamer to keep lookout.**
   Every steamer is required to have at least one lookout in the eyes of the ship.

2. **Collision ⬅︎43—Steam vessel to keep out of way of sailing vessel.**
   When a steam vessel and a sailing vessel are proceeding in such directions as to involve risk of collision, the steam vessel shall keep out of the way of the sailing vessel.

3. **Collision ⬅︎44—Sail vessel should hold her course as to care toward steam vessel.**
   It is the primary duty of a sailing vessel as to risk of colliding with steam vessel to hold her course and speed, and to do so as long as the steamer can avoid collision.

⬅︎For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**4. Collision ⬄108—Acts of sailing vessel, in agony of collision with steamer, immaterial.**

When it becomes apparent to a sailing vessel that a steamer does not intend to conform to the law concerning its duty to keep out of the way of the sailing vessel, what is done or omitted to be done by the sailing vessel in the agony of collision can make no difference, as it is impossible to consider a decision so made as a fault.

**5. Collision ⬄48—Burden on vessel to justify departure from rules.**

When a sailing vessel departs from the rule as to holding her course and speed when collision with a steamer is imminent, the burden of proof rests upon her to justify the departure, taking upon herself the obligation of showing both that her departure was necessary at the time it took place in order to avoid immediate danger, and that the course adopted was reasonably calculated to avoid that danger.

**6. Collision ⬄49—Strong case must be made out against sailing ship colliding with steamer.**

In cases of collision between a steamer and a sailing vessel, a strong case must be made out if the sailing vessel is to be held in fault.

**7. Collision ⬄49—Steamer colliding with sailing vessel held in fault.**

In a proceeding by the owner of a sailing vessel colliding with a steamer for limitation of liability, *held* that the steamer was solely in fault.

**8. Collision ⬄11—Rules rigorously enforced.**

In controversies arising out of collisions between vessels, the courts should rigorously enforce the collision rules, that the object for which they were framed may be attained.

**9. Collision ⬄154—Admiralty rule promulgated after collision not necessarily controlling.**

Rule 7 of the Admiralty Rules of Practice (267 F. viii) promulgated by the Supreme Court on December 6, 1920, to become effective on March 7, 1921, providing that if costs shall be awarded by the court to either or any party, then the reasonable premiums or expense paid on all bonds or stipulations or other security given by that party in the suit shall be taxed as part of the costs of that party, was not necessarily controlling in a collision proceeding wherein the costs were taxed before such rule was promulgated.

**10. Admiralty ⬄124—Cost of stipulation included in costs.**

In a proceeding to limit liability of a vessel arising out of a collision, where the right to limit was contested, *held* that the cost of stipulation should have been included in the amount of costs taxed, though the costs were taxed prior to the promulgation of rule 7 of the Admiralty Rules of Practice (267 Fed. viii) by the Supreme Court.

Appeal from the District Court of the United States for the Southern District of New York.

In the matter of the petition of the Actieselskabet Christiansand, owner of the Norwegian bark Stifinder, for limitation of liability in connection with a collision with the steamship Selje, owned by the Aktieselskabet Rederiet Odfjell, and carrying a cargo owned by the Cerro de Pasco Corporation. Decree for petitioner, and the owners of the Selje and cargo appeal. Modified and affirmed.

The cause came here on appeal from a final decree entered on February 3, 1919.

The case arose out of a collision between the Norwegian bark Stifinder and the Norwegian steamship Selje, which occurred in the Atlantic Ocean on May 24, 1917, and which resulted in the sinking of the steamship with her cargo, there being a total loss.

The petitioner, Actieselskabet Christiansand, is, and was at all the times mentioned herein, the sole owner of the Stifinder. It is a corporation exist-

⬄For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ing under the laws of the kingdom of Norway, and it has its place of business at Christiansand, Norway. It brought this proceeding for the purpose of exonerating the vessel or of limiting liability to the value of the vessel and her pending freight, i. e., $322,595.46.

Aktieselskabet Rederiet Odfjell is a corporation existing under the laws of the kingdom of Norway and as owner of the steamship Selje filed a claim in the sum of $1,200,000, the value of the steamship.

Cerro de Pasco Copper Corporation is a corporation organized under the laws of the state of New York, and has its principal place of business in the city of New York. As owner of the cargo of coke which was shipped on the Selje, it filed a claim in the sum of $111,601.40; that being the value of the cargo.

The court below dismissed the libels on the ground that the collision was due solely to the fault of the Selje.

Harrington, Bigham & Englar, of New York City (Vine H. Smith, of New York City, of counsel), for appellants.

Haight, Sandford, Smith & Griffin, of New York City (John W. Griffin, of New York City, of counsel), for appellee.

Duncan & Mount, of New York City (O. D. Duncan and Warner C. Pyne, both of New York City, and Raymond B. Stefferson, of counsel), for the Selje.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). This is a proceeding in admiralty to limit liability for the loss of the steamship Selje. As indicated above the proceeding grew out of a collision on the Atlantic Ocean in May, 1917, between the Stifinder, a sailing vessel, and the Selje, a steam vessel. As a result of the collision the steamer, valued at $1,200,000, was lost along with its cargo which was valued at $111,601.40. The court below dismissed the proceedings on the ground that the sailing vessel was the privileged vessel and had a right, under the circumstances of the particular case, to keep its course and speed.

The Stifinder was built of steel; had one deck of wood, and three steel masts; was 252½ feet in length and her beam was 39 feet. She sailed from Savannah, Ga., on May 22, 1917, carrying a cargo of 2,764 tons of cotton seed oil cake, and was bound for Denmark, via Halifax.

The steamship Selje was 293 feet long, and her beam was about 43 feet. Her dead weight was 3,750 tons, and her gross tonnage was 2,186. She left Baltimore on May 22, 1917, with a full cargo of coke, consisting of about 2,522 tons, and was bound for Callao, Peru.

The collision occurred some 30 miles to the southward of Diamond Shoal Lightship, in the early morning of May 24, 1917, at about 3:10 a. m. The night was dark, but the atmosphere was clear. There was a steady fresh breeze from the north, and a moderate sea was running. The stem of the Stifinder struck the steamer's starboard side in the way of No. 1 hatch, and the steamer sank within 8 or 10 minutes thereafter, her crew being picked up by the Stifinder. Everything was lost, including the ship's papers and the clothes of the crew other than that which they were wearing.

The Stifinder was on a course of E. N. E., and was sailing on the port tack, six points from the wind, which was as close as she could sail, and was making seven knots. She was carrying all her lights, and they were burning brightly. And the red light on that kind of a night could be seen about 3 miles. The Selje's course was S. ¼ W., and she was traveling at eight knots.

It was a good night for seeing lights and those in charge of the sailing vessel (Stifinder) saw the steamer Selje several miles away; and upwards of half an hour before the collision, and thereafter kept her constantly in view. The first mate who was in charge said that he saw through his glasses at 2:30 the two mast head lights of the Selje. The lookout reported the lights and they were about five points on the port bow. The lights seen were the white lights, and afterwards about 10 minutes before the collision the green light was observed. The red light was not seen.

[1] Until a few minutes before the collision the Selje was in charge of the second mate, 22 years of age, who had just obtained his certificate. The captain had turned in about 9 or 10 o'clock, and was not thereafter on the bridge. He was aroused from sleep by hearing the signal given to the engine just before the collision, and went right on deck, and the collision followed within 10 seconds thereafter. The wheel was hard astarboard, and the engines were going at full speed ahead when he reached the deck, and he ordered them immediately stopped. The mate had previously ordered them full speed astern, and before that order could be executed had ordered them full speed ahead. The lookout was not in his place, having left it some 5 or 6 minutes before the collision. It does not appear that any one had taken his place, and the second mate, who was in command and on the bridge, had not been informed that the lookout had left his post. And a lookout is both "the eyes and ears of the ship." The Sagamore, 247 Fed. 743, 754, 159 C. C. A. 601. Every steamer is required to have at least one lookout in the eyes of the ship. The Colorado, 91 U. S. 692, 23 L. Ed. 379; The Oregon, 158 U. S. 186, 193, 15 Sup. Ct. 804, 39 L. Ed. 943; The Ottawa, 3 Wall. 268, 18 L. Ed. 165. The mate said that he had not seen the Stifinder until just before he gave the signals which brought the captain to the bridge. The captain testified:

"Q. Did the second mate give you any reason why he hadn't seen the sailing vessel sooner? A. No; he said absolutely he had been on the bridge and had sharp lookout as usual, and absolutely not observed the sailing vessel before she was close to, and then he saw his light."

Nearly an hour after the collision, while it was still dark and while he was in the lifeboat, the captain could see the Stifinder when she was 3 miles away, so he testified. As there is no doubt that the Stifinder's lights were burning brightly prior to the collision, the failure of those on the steamer to see her can only be explained by the fact that the lookout was not at his post, and the mate in command at the time was inattentive to his task. The fault of the Selje was, beyond all question, gross and inexcusable.

The following is an excerpt from the testimony of the officer in charge of the Stifinder:

"Q. How near was the steamer to you when you got back aft? A. About 600 feet.

"Q. She was pretty close then, was she? A. Yes.

"Q. When was it that you first thought there was probably going to be a collision? A. When I went aft. I thought I wasn't sure yet before I came on the poop; I wasn't sure.

"Q. At that time you think the steamer was about 600 feet or so away? A. About 600 feet.

"Q. You were still on your same course? A. On our same course.

"Q. What could you have done, if anything, to have avoided collision? A. I couldn't see. I couldn't do anything then.

"Q. Up to that time what had you thought about what the steamer was going to do, or might do? A. I thought he was going ahead of me, clear of my bow. Most of the steamers try to do the same thing. I thought he was the same kind of man, to try to do the same thing. He was going faster than I was.

"Q. Before this time when he got so close were you able to tell whether he was going to keep on going, or reverse his engines, or what he was going to do? A. No; I couldn't tell about that.

"Q. Why was it you held your course? A. If I had changed my course in any way, if I had fell off the ship, he would hit me amidships; if I had luffed up to the wind, I would have had him amidship.

"Q. So you thought it was best to hold your course and speed? A. Yes.

"Q. And that was what you did? A. That is what I did; it was my duty to do the best I could.

"Q. How long, with the weather conditions as they were that night, would it have taken you to change your course either direction, say five points? A. Take about 5 minutes to change the course, before she would swing any.

"Q. As you look back at the matter now, was there anything, as you see it to-day, that you could have done to help matters? A. No; I can't see anything."

[2, 3] If the mate's estimate is correct that the boats were about 600 feet apart when he made up his mind that a collision was inevitable, the collision actually took place about half a minute thereafter. The District Judge has found, and we think rightly, that until the vessels were some 600 feet apart the steamer could, by proper use of helm and engines, have avoided collision. If that is so, then up to that moment the Stifinder had a right to suppose that the steamer would change her course and the collision would be avoided.

In the Highgate, 6 Asp. M. C. 512, 514, Sir James Hannen said:

"A steamer is able to maneuvre so as to keep out of the way of another vessel even when very close to her. I have had occasion to comment on the practice with reprobation, as experience in this court teaches that steamers very often cut it exceedingly fine. How is a sailing vessel to know that a steamer is not going to cut it fine, or to know in what particular direction she will move at the last moment? The guide of the steamer's action is the presumption that the sailing vessel will keep her course."

The rule is that—

"When a steam vessel and a sailing vessel are proceeding in such directions as to involve risk of collision, the steam vessel shall keep out of the way of the sailing vessel."

The primary duty of a sailing vessel is to hold her course and speed, and to do so as long as the steamer can avoid collision. Not to do so is to add to the dangers of the situation. In the present case no duty devolved upon the bark to make any movement to change her course until after it became evident to those in charge of her that the steamer

could not do anything to avoid collision. Maguire v. Sylvan Glen (D. C.) 2 Fed. 910.

[4] The Stifinder's duty was to keep her course and speed in the expectation that the Selje would obey the law and keep out of the way. When it became apparent that the steamer did not intend to conform to the law, the vessels were then in extremis, and what was done or omitted to be done by the Stifinder in the agony of collision can make no difference, as it is impossible to consider a decision so made as a fault. We agree with the learned counsel who argued this case for the petitioner that to enter upon intricate calculations of what could or could not have been done in 40 seconds, illustrated by elaborate diagrams involving days of labor, and to require that the decision of a seaman, confronted with a sudden emergency and obliged to act on the instant, shall be judged by such calculations and diagrams made weeks afterwards, would be a travesty.

In The Fannie, 11 Wall. 238, 240, 20 L. Ed. 114, a schooner meeting a steamer approaching her on a parallel line with the difference of half a point in the courses of the two collided. The steamer alone was held at fault. The court said:

"The steamer was bound to keep out of the way of the schooner, and to allow her a free and unobstructed passage. Whatever was necessary for this, it was her duty to do, and whatever obstructed or endangered the schooner in her course it was the duty of the steamer to avoid. There was but a single obligation resting on the schooner. It was passive rather than active, the duty to keep on her course. If, therefore, the schooner did not change her course, so as to embarrass the steamer and render it impossible, or at least difficult, for her to avoid a collision, there can be no doubt that the steamer alone is answerable for the damages."

And the above was approved and followed in The Lucille, 15 Wall. 676, 679, 21 L. Ed. 247.

[5] If the sailing vessel had disregarded the ordinary rule of holding her course and speed, having made up her mind that the steamer was not intending to perform the duty of a burdened vessel and keep out of her way, and at the same moment that she changed her course the steamer had also changed, there would be reason for thinking that she would have been held liable for the collision which ensued. The Marguerite (D. C.) 87 Fed. 953, 959. In The Blue Jacket, 144 U. S. 371, 12 Sup. Ct. 711, 36 L. Ed. 469, a sailing vessel in the straits of Fuca believed that collision with a steam tug was imminent, and, instead of keeping her course, as the privileged vessel, changed it when about one-third of a mile from the place of collision, and put her helm hard astarboard thinking it necessary to do so to escape collision. The collision would not have occurred if the sailing vessel had kept her course and she was held solely at fault. In all such cases it has been said that when a ship departs from the rules the burden of proof rests upon her to justify the departure. She takes upon herself the obligation of showing both that her departure was necessary at the time it took place in order to avoid immediate danger, and that the course adopted was reasonably calculated to avoid that danger. See Elizabeth Jones, 112 U. S. 514, 523, 5 Sup. Ct. 468, 28 L. Ed. 812; Eliza-

beth Jenkins, L. R. 1 P. C. App. 501; The Columbian, 100 Fed. 991.

In The Lafayette (C. C. A.) 269 Fed. 917, decided by this court, and which involved a collision between a steamer and a sailing vessel in which the latter vessel kept her course unchanged up to the very moment of collision, the steamer was held solely at fault. We declared that—

"When a vessel is put in great peril without any fault of her own, the question of her negligence in a sudden emergency does not depend upon whether she did everything she might have done or pursued the best possible course. In such cases the rule is that a mistake made in the agony of almost certain collision is regarded as an error for which the vessel that caused the peril should alone be held responsible."

And see The Nacoochee, 137 U. S. 330, 340, 11 Sup. Ct. 122, 34 L. Ed. 687; The Nichols, 7 Wall. 656, 666, 19 L. Ed. 157; The Carroll, 8 Wall. 302, 19 L. Ed. 392; The Oregon, 18 How. 570, 15 L. Ed. 515; The Shawmut (D. C.) 261 Fed. 616, 622.

[6, 7] The case under consideration being one of collision between a steamer and a sailing vessel, we may again point out what we also referred to in The Lafayette, supra, that in this class of cases a strong case must be made out if the sailing vessel is to be held in fault. We do not think in this case, as we did not think in that case, that the circumstances are such as to justify us in saying that the sailing vessel was in fault for holding her course. The Selje's fault was gross and the blame is hers alone. It would neither be justice, nor in accordance with the established principles of the admiralty law, to compel the Stifinder to bear any part of the loss which resulted from the flagrant misconduct of the other vessel, it not having been made apparent that the Stifinder committed any fault whatever prior to the time when the Selje put her in extremis. We add what we have already indicated, that we do not find that she committed one then.

[8] It is necessary that the courts should rigorously enforce the collision rules that the object for which they were framed may be attained. As the Supreme Court said in Belden v. Chase, 150 U. S. 674, 699, 14 Sup. Ct. 264, 272 (37 L. Ed. 1218):

"Obedience to the rules is not a fault even if a different course would have prevented the collision, and the necessity must be clear and the emergency sudden and alarming before the act of disobedience can be excused. Masters are bound to obey the rules and entitled to rely on the assumption that they will be obeyed, and should not be encouraged to treat the exceptions as subjects of solicitude rather than the rules."

Undoubtedly there are cases in which sailing vessels and steamships have collided in which the sailing vessels have been held in fault for not changing their course. But all such cases have involved exceptional circumstances. Such a case was the Sunnyside, 91 U. S. 208, 23 L. Ed. 302. In that case a collision occurred on Lake Huron 3 miles from shore, between a sailing vessel and a steam tug. The tug, in conformity with a well-known usage in these waters, was waiting for her tow, with her machinery stopped, and was drifting. The sailing vessel kept her course, and the court held that under the special cir-

cumstances the right of the sailing vessel to keep its course applied as to vessels in motion, but not to vessels at anchor, or lying at a wharf, nor to steam tugs lying with their helms lashed waiting for employment. But in the instant case there are no special circumstances to take it out of the general rule.

When the petition for exoneration from or limitation of liability by the owner of the Stifinder was filed the court entered an order, as is usual in such cases, appointing a Commissioner to appraise the value of the petitioner in the vessel and her pending freight. On the coming in of the Commissioner's report it was confirmed by the court, and an order was entered, requiring that the petitioner either pay into court the appraised value, with interest, or at its option give a stipulation for the payment for value in the sum of $327,595.46. And when the final decree was entered the petitioner sought to tax the cost of this stipulation, which amounted to $1,613, but the clerk declined to include it in the amount of the costs taxed. In this refusal he was sustained by the court below. The petitioner asks for a review of this ruling.

In The William E. Gladwish, 215 Fed. 900, 132 C. C. A. 138, this court had a like question before it. A vessel owner, whose petition for limitation of liability was granted and who gave a stipulation for release of the vessel, claimed, on her complete exoneration from blame, that he was entitled to the amount of $360 paid as premiums on the stipulation. The court below allowed the Gladwish the full costs of the litigation, but refused to allow the $360 paid by her owner for her release.

This court sustained the court below and said:

"The limitation of liability was allowed in the interest of the Gladwish. She alone profited by this proceeding, which was ex parte. The owner of the barge and her cargo did not contest the right to limit the liability of the tug. It would have been entirely satisfactory to them to have placed her in the hands of a trustee, but her owners evidently thought that they should have the use of the tug during the litigation, and so, solely for their benefit, she was released and bonds substituted."

The W. A. Sherman, 167 Fed. 976, 93 C. C. A. 228, also involved a limitation of liability. This court in that case stated the rule as follows:

"After a petitioner has surrendered his vessel or given a stipulation for or paid the amount of her appraised value into court, he has no further concern in the proceeding, unless claimants contest his right to limit or he contests his liability. Expenses he has incurred for the purpose of availing himself of the act of Congress he should stand. They are such as cost of filing petition, and stipulations for costs and value, premium, if any, for stipulations, expense of appraisal, or of bill of sale transferring the vessel, commissioner's report on appraisal, expert fees, etc. If any issue is contested in the proceeding between the petitioner and the claimants or any claimant, the costs should fall as usual upon the losing party. They are such as witness fees, mileage, deposition fees, proctor's fee. The cost of bringing in the creditors, such as filing, issuing, and publishing the monition, should be paid out of the fund, on the principle that it should administer itself, and this duty to administer itself applies even when, the petitioner being held not liable, there is no other distribution than to return it to him."

In the case above two issues were involved: First the petitioner's right to limit; and, second, the petitioner's liability. Of these two issues only the last was contested.

The instant case is distinguishable from the two cases above referred to, in that in those cases the petitioner's right to limit liability was uncontested, while in this case it was contested. In The Wm. E. Gladwish Judge Coxe expressly stated in his opinion that the right to limit the liability of the tug was uncontested. And in The W. A. Sherman Judge Ward's opinion also states that the only contested issue was that of liability.

[9] We observe also that rule 7 of the Admiralty Rules of Practice (267 Fed. viii), promulgated by the Supreme Court of the United States on December 6, 1920, to become effective on March 7, 1921, provides as follows:

"If costs shall be awarded by the court to either or any party, then the reasonable premiums or expense paid on all bonds or stipulations or other security given by that party in that suit shall be taxed as part of the costs of that party."

The above rule was not in force, and had not even been promulgated when the costs were taxed on February 2, 1920, and is not therefore necessarily controlling upon the question now under consideration.

[10] But as this court in denying the right to tax the costs of a stipulation for value in proceedings for a limitation of liability has heretofore carefully confined its ruling to cases where the right to limit has been uncontested, we think that as the right to limit was contested in the present case, and the court below did award costs, that the cost of the stipulation, amounting to $1,613, should have been included in the amount of costs taxed.

The decree, subject to the modification above indicated, and which is directed to be made, is affirmed.