## THE STEEL INVENTOR.

## In re UNITED STATES STEEL PRODUCTS CO.

## UNITED STATES v. BELL et al. (CALIFORNIA PACKING CORPORATION et al., Interveners).

### No. 261.

Circuit Court of Appeals, Second Circuit.

Aug. 4, 1930.

See, also, 36 F.(2d) 399.

Haight, Smith, Griffin & Deming, of New York City (Charles S. Haight, Kenneth B. Halstead, John W. Griffin, and W. P. Sedgwick, all of New York City, of counsel), for petitioner-appellant.

Charles H. Tuttle, U. S. Atty., and Horace M. Gray, Sp. Asst. U. S. Atty., both of New York City, for claimant-appellant.

Burlingham, Veeder, Fearey, Clark & Hupper, Ralph W. Brown, and David S. Polier, all of New York City (Chauncey I. Clark, Ralph W. Brown, and P. Fearson Shortridge, all of New York City, of counsel), for certain claimants for loss of life, personal injuries, and personal effects.

Bigham, Englar, Jones & Houston, of New York City (Leonard J. Matteson, of New York City, of counsel), for California Packing Corporation et al., intervening petitioners-appellees.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

CHASE, Circuit Judge (after stating the facts as above).

The Steel Inventor, a single screw tramp, 440 feet over all, with a general cargo for Philadelphia and New York, was bound from San Diego to Balboa on the night the collision occurred. At about ten minutes to 12

midnight, when she was under full speed ahead and making about 12½ knots over the bottom and about 11½ through the water, her second officer, who was on watch, first saw a white light well ahead and a little on the port bow. As minutes passed, another white light appeared which seemed to be dead ahead. Three or four minutes before midnight, the chief officer came to the bridge to relieve him and the second officer called his attention to the lights. At that time a white, a red, and a green light could be seen on the port bow and dead ahead another white light. The chief officer watched these lights for some time, now impossible to determine with accuracy, but probably for a quarter of an hour. He then could see a red, green, and white light on one vessel, another showing a red light and at least two other vessels showing white lights. He knew that the Pacific fleet was maneuvering in those waters and at once called the captain with the statement that "the whole United States Navy was ahead." The captain, who had been asleep below but was fully dressed, was on the bridge in a few seconds. As nearly as can be determined this was about ten minutes past midnight. With glasses he could see many lights ahead, both white and colored, although he was then unable to make out any definite formation. He at once realized that the fleet was ahead, and gave the order immediately hard aport.

As later developed, what he saw were the lights of the Fifteenth Destroyer Division which formed the vanguard of the United States Pacific fleet. This division was then navigating, and until the collision continued to navigate, on a course 302 degrees true in two columns of three ships each. About a nautical mile separated these columns. In the right or east column from forward to aft was the Wickes, about 300 yards astern was the Evans, and about 300 yards astern of the Evans was the Buchanan. Before changing her course, the Steel Inventor was very nearly dead ahead of the Wickes. The course of the destroyers and of the Steel Inventor was then within three degrees of being directly opposite. In the left or west column the Aaron Ward was leading, with the Woolsey about 500 yards astern, and the Philip 300 yards astern of the Woolsey. The Ward was somewhat in advance of the Wickes at the head of the east column, but the vessels following were nearly abeam the corresponding ships in the other column. The Woolsey was 311 feet long with twin screws. The destroyers were making 18 knots through the water, and all held their course and speed until the Woolsey reversed and then immediately changed to full speed ahead when collision was imminent.

When he went onto the bridge, the captain of the Steel Inventor could also see the lights of what proved later to be the Thirty-Third Destroyer Division farther to the south and east, and knew, although none of its lights could be seen, that the main fleet was coming up behind. But, as none of these ships were nearer than ten miles before the disaster we need not now pay any attention to them.

When the Steel Inventor's captain ordered the change in course, his ship swung under this helm from 119 degrees true to a little over 183 degrees true and then steadied on 183 degrees. There is much conflict in the testimony as to the distance the Inventor was from the nearest naval vessels when this order was given. It is utterly impossible to reconcile much of this evidence on any reasonable basis. It seems certain, however, that the distance must have been at least more than two miles and probably three, as will be seen later.

When this change of course was made, no signal was given. After steadying at 183 degrees true, there is ample, though not uncontradicted, evidence to support the District Court's finding that the Steel Inventor maintained her course and speed until within a few seconds before the collision, when she tried to prevent it by starboarding. We accept that as the fact. One of the things which makes it very difficult to determine the time of different occurrences is that the warships were running on fifth zone time, about an hour later than that of the Steel Inventor, and the clocks on the different ships using fifth zone time varied some minutes. The time of the collision is as definitely fixed as is possible as being shortly before 12:20 by the time of the Steel Inventor, and this, though also contradicted, is reasonably well supported by other testimony. The evidence strongly tends to show that at least eight minutes may have elapsed, and certainly no less than five, between the time the Steel Inventor steadied on her new course and the collision. The log of the Wickes shows that the Steel Inventor's change in course was noticed at 1:03 a. m., fifth zone time, and that the collision was at 1:11 a. m., by the same time, making the elapsed time exactly eight minutes. The evidence from the Philip is to the effect that the Steel Inventor showed her red light alone at least as early as five minutes past 1 a. m., and that the

collision occurred at 1:10. Evidence from the Buchanan tends to show that at 1 o'clock the Steel Inventor's red light was seen alone from that ship, and that the collision occurred at 1:05 a. m. All in all, this shows with sufficient certainty that not less than five minutes before the collision the Steel Inventor's red light alone was visible to the destroyers, and, as the light was actually seen from the Wickes for eight minutes, it is reasonable to believe that it was visible to the Buchanan and the Philip sooner than it was noticed by them. It must have been visible to the Woolsey at least as long as it was to the Philip, for the Woolsey was in line ahead of the Philip. If we take the mean between these two for the purpose of minimizing any error in making a short computation, which we realize is based on so many doubtful factors that it is not to be taken at face value but only for the purpose of checking estimates in the testimony, and consider that six and one-half minutes elapsed between the time the Steel Inventor changed her course and the collision, the Woolsey would have run in that time about 1.95 nautical miles. For the Steel Inventor, allowance must be made for the cut in speed when she was swinging. This her captain put at about 25 per cent. and we are willing to accept it, as Knight's Modern Seamanship (9th Ed.) pp. 347–349, states that the drop will be about 60 per cent. up to the time a ship has reached the point where the curve becomes uniform. The change here was less than that and at 64 degrees only it would seem that the captain was about right. On this basis, the Inventor's speed dropped to approximately 8.6 knots while she was making the turn. She picked up to full speed in two or three minutes. If given an average speed of ten knots after making allowance for the drop caused by her swing, she ran in six and one-half minutes about 1.05 nautical miles to the point of collision. On this basis, the change in course began at least three miles from the Woolsey. The deck officer of the Wickes estimated the distance from his ship to the Steel Inventor when he first noticed the change in course to be three miles. If the Steel Inventor was to starboard of the column headed by the Wickes, as some of the witnesses indicate, or about dead ahead, as seems better established, she was farther from the Woolsey than from the Wickes. But, to offset as best we can any errors in observation and in the above computation, the distance may safely be put at between two and three nautical miles. If the elapsed time is taken at the minimum of five minutes, the distance so computed would be 2.3 plus miles.

For the moment, the problem is centered on whether the Steel Inventor was free to change her course as, when, and where she did. But, whether she was or not, no ship but the Woolsey was injured, so she must now be conceded freedom of choice for the purposes of this case as to all but the Woolsey. Still we need not delve into technical niceties to determine the minimum distance in terms of yards or miles as to when her freedom of choice ceased as a matter of law. She actually did present her red light alone on a steady crossing course at least five minutes and at least two miles away from the point of collision. In all probability both the time and space were greater. This gave the Woolsey such ample time to avoid collision by complying with her duty as the burdened vessel to keep out of the way that the fault, if any, of the Steel Inventor in changing her course as she did, and that without signaling, becomes remote. The Columbia (D. C.) 29 F. 716; The Shawmut (D. C.) 261 F. 616; The Nereus (D. C.) 23 F. 448; The Pleiades (C. C. A.) 9 F. (2d) 804. She established her new course on a definite basis under the starboard hand rule so long before the Woolsey was called upon to act because of the change that, whether the Woolsey was placed in the position of the burdened vessel strictly as a matter of right or not, she was in no way embarrassed, and was bound to take notice that she was in fact burdened and to act accordingly. She was a very able ship, of high speed and great maneuvering power. It was then her duty to accept the navigation of the Steel Inventor with whatever it entailed; not to assume that it was so wrong that it would be changed, but to take it for granted that the Steel Inventor would keep her course and speed as the rules of navigation required. Article 21, International Rules (33 USCA § 106). Nor was it any excuse for her to proceed on the assumption that the Steel Inventor had already violated the rules of navigation once in changing her course and would do so by changing again. The Woolsey easily could and consequently should have avoided going ahead of the Steel Inventor, article 22, International Rules (33 USCA § 107), and was bound to, "if necessary slacken her speed or stop or reverse," article 23, Id. (33 USCA § 108). Having the time and opportunity to do so, it was her duty to keep out of the way. Article 19, International Rules (33 USCA § 104). See The Cranford (C. C. A.) 27 F. (2d) 710–712. By

keeping right on in the face of the danger which the maintenance of her course and speed increased with every passing minute, she was guilty of such gross violation of the starboard hand rule for so long a time after she could have acted to prevent the subsequent disaster that any doubt as to the wisdom and good seamanship of the Steel Inventor's captain must be resolved in his favor. City of New York, 147 U. S. 72, 13 S. Ct. 211, 37. L. Ed. 84; The Oregon, 158 U. S. 186, 15 S. Ct. 804, 39 L. Ed. 943.

Yet we have been careful not to stamp with approval the navigation of the Steel Inventor in establishing her crossing course when and as it was done. We go no farther than to say that, whether it was right or wrong at the time, it was so clearly a remote cause of the collision that we are forced to the conclusion that the disaster must be attributed wholly to the gross fault of the Woolsey. Cases, supra. When the collision was imminent, both ships acted in extremis, and any mistake at that time must be attributed to the prior fault which was the proximate cause. The Ludvig Holberg, 157 U. S. 60, 15 S. Ct. 477, 39 L. Ed. 620; The Lafayette (C. C. A.) 269 F. 917; The Oregon, supra.

In re U. S. Steel Products Company, supra, is full authority to the effect that the petitioner's cross-libel should not have been dismissed. The suggestion of the government that the petitioner should have refiled it or filed a new libel after the Public Vessels Act of March 3, 1925 (46 USCA §§ 781–790), took effect leads to the realm of futile technicalities which we decline to enter. We are not unmindful of the fact that the Woolsey was a total loss, but, as the government has not yet seen fit to undertake to have its liability limited, let that phase of the matter await the time when, if ever, it does arise. In view of our decision as to liability, all other questions raised on this appeal are moot.

Order and decree reversed.