## THE QUEVILLY.

### COMPAGNIE MARITIME NORMANDE v. UNITED STATES.

District Court, S. D. New York.
April 23, 1935.

Kirlin, Campbell, Hickox, Keating & McGrann, Robert S. Erskine and A. V. Cherbonnier, all of New York City, for libelant.

Martin Conboy, U. S. Atty., for Southern District of New York, and Charles E. Wythe, both of New York City, for respondent.

536

HULBERT, District Judge.

Compagnie Maritime Normande, the libelant, formerly known as Societe Anonyme du Quevilly, is a French corporation and the owner of the four-masted auxiliary bark Quevilly.

The United States of America is a sovereign state and the owner of the destroyer Sampson.

On Friday evening, January 26, 1917, the Quevilly was off the south coast of Long Island approaching New York Harbor. The night was clear, but dark; sea smooth, weather very cold. There was a strong breeze blowing from the northwest and the Quevilly was under sail and there is no proof that her auxiliary engines were in use.

The United States destroyer Sampson was astern and off the port quarter of the Quevilly and overtaking the latter on a converging course. About 6:20 p. m. the vessels came into collision.

Thereafter, the Secretary of the Navy of the United States, acting under his powers and authority, convened a Naval Board of Inquiry, which said board investigated the facts involved in the said collision.

This suit was instituted pursuant to and by virtue of the authority given by private law No. 71, 48 Stat. 1323, enacted by the Seventy-Third Congress, Second Session, duly approved by the President of the United States of America on the 18th day of April, 1934, and entitled, "An Act Conferring jurisdiction upon certain courts of the United States to hear and determine the claim by the owner of the four-masted auxiliary bark Quevilly against the United States," etc., which act provided that such suit should be begun in this court within four months of the date of the approval of said act and it was conceded by the respondent that the libelant has complied with all of the provisions thereof.

Upon the trial of the action it was stated by the proctor for the libelant that he was unable, by reason of the lapse of time since said accident until the final enactment of said statute, to produce any eyewitnesses to said accident. While no effort seems to have been made meanwhile to perpetuate the testimony of the Quevilly's officers and crew, by consent it was agreed that the entire testimony contained in the "Record of proceedings of an investigation conducted at the Navy Yard, New York, by order of the Senior Officer present afloat, to inquire into the collision of the U. S. S. 'Sampson' with an unknown sailing vessel at about 6:20 P. M. January 26, 1917, January 27, 1917," or a true copy thereof be received in evidence on the trial of the case upon the offer of either party, with the same force and effect as if offered under oath in this suit and no objection to the competency of said evidence to be made.

Upon the production and consideration of said record I find that Lt. Schmidt, the officer of the deck of the Sampson, on January 26, 1917, about 6:10 p. m. sighted a white light on the starboard bow of the Sampson which he approximated to be distant about 5 miles. According to Schmidt, no side lights were then visible. The lookout of the Sampson, Knabe, observed the same light at about the same time, but also claims to have seen and reported a port running light (flickering)—both lights on the same vessel. He testified: "The white light appeared about three points on the starboard bow and the red light about one point." The Sampson was making about 12 knots on course 307 degrees true. Both vessels seemed to Schmidt to be on nearly parallel courses. About ten minutes after he first observed the white light, it appeared to Schmidt to be about 2 miles away and a little abaft of her former bearing; the port side light was not yet visible to Schmidt. The Sampson was laying a course for Ambrose Lightship, intending to leave it about one-half mile on her starboard beam, when Schmidt made out the port side light of the bark, very faintly, causing him to believe she was quite some distance away. Then, observing that the Quevilly was crossing his bow, he caused the course of the Sampson to be swung *to the left*, when the Quevilly, recognized for the first time as a sailing ship, loomed up about 500 yards away. Her port side light was still very faint as he claimed she swung rapidly toward the Sampson, whose engines were stopped and an order given, "Hard left rudder," followed by full speed astern on both engines. Yells in a foreign tongue were heard from the bark. The Sampson swung off to the left over 90 degrees and, it is claimed, was dead in the water at the time the two vessels side swiped each other, the starboard of the Sampson against the port side of the Quevilly, which continued on her way, so that it was not possible to identify her.

If, at the time Lt. Schmidt stated he observed the stern light of what afterward proved to be the Quevilly 5 miles distant, and ten minutes later, when the Sampson had been proceeding at 12 knots, the Quevilly was only 2 miles distant, Schmidt must have been mistaken in his estimate of the distance when he first sighted the Quevilly, for, making no allowance for the speed of the latter, the Sampson could not have cut down the distance between them by 3 miles in ten minutes. So also it is evident that Schmidt misjudged the distance of the Quevilly when she "loomed up about 500 yards away."

An examination of the log of the Sampson shows the direction of the wind at 4 o'clock p. m. to have been 270°; 5 o'clock, 320°; *6 o'clock 340°*; and *7 o'clock 350°*, with a force at all of said times of 4 on the Beaufort scale. In other words, the wind was constantly hauling towards the north.

From. an analysis of the evidence it appears to me that the vessels in question were upon converging courses and not on parallel courses nor nearly so. The Quevilly was on the starboard tack. The Sampson was headed up for Ambrose Light and endeavored to slip through the lee of the bark. Of course, if headed by a temporary or local shift of wind, it is logical that a sailing vessel must bear off whenever her sails lift, to keep them full.

Therefore, I am of opinion that the Sampson erred in not steering a course to pass under the stern of the Quevilly. This is borne out by the statement of Knabe who informed the officer of the deck that the sailing vessel was going to cross the bow of the Sampson, and when Knabe left the bridge he thought there would be a collision as it appeared to him that the sailing vessel, by force of the wind, was making leeway toward the Sampson.

For the foregoing reasons, the Sampson must be held to have been at fault.

"She owed the schooner the duty of avoiding a collision and the obligation to keep out of her way. If doubt results from the evidence, it should be resolved against the steamer rather than the schooner." The Charterhythe v. The Litchfield, 1927 A. M. C. 992, 993.[1] See, also, The Stifinder (C. C. A. 2d) 275 F. 271.

There must be a decree for the libelant.